**ALLARD ENTERPRISES, INC., d/ b/a/ Allard Programming Resources, Plaintiff–Appellant,**

v.

**ADVANCED PROGRAMMING RE- SOURCES, INC., and Barry Heag- ren, Defendants–Appellees.**

No. 97–3417.

United States Court of Appeals, Sixth Circuit.

Argued April 22, 1998.

Decided June 4, 1998.

Gail L. Morrissey (argued and briefed), Standley & Gilcrest, Dublin, OH, for Plaintiff–Appellant.

Timothy E. Miller (argued and briefed), Joanne S. Peters (briefed), Isaac, Brant, Ledman & Teetor, Columbus, OH, for Defendants–Appellees.

Before: KENNEDY and BATCHELDER, Circuit Judges; HULL, District Judge.*

## OPINION

KENNEDY, Circuit Judge.

Plaintiff Allard Enterprises, Inc. ("Allard Enterprises") sued Advanced Programming Resources, Inc., and its sole shareholder, Barry Heagren, (collectively "defendants") in the United States District Court for the Southern District of Ohio, alleging federal claims of trademark infringement and false designation of origin, and state law claims of trademark infringement, unfair competition, and deceptive trade practices. Defendants filed a counterclaim alleging similar state law claims and a federal false designation origin claim against plaintiff. Their dispute arises from plaintiff's use of the mark "APR OF OHIO" in connection with the placement of employees with computer and data processing skills and defendants' use of the mark "APR" in association with similar services. The parties stipulated that their service marks were confusingly similar and consented to trial before a United States magistrate judge, who determined that defendants first used the mark in commerce and permanently enjoined plaintiff from continuing to use its service mark. Plaintiff now appeals. For the following reasons, we affirm the trial court's priority determination, vacate its order granting injunctive relief, and remand this case for further proceedings.

## I. Factual and Procedural Background

This controversy arises from the parties' competing uses of service marks containing

---

* The Honorable Thomas G. Hull, United States District Judge for the Eastern District of Tennes- see, sitting by designation.

the acronym "APR." To understand their claims, it is necessary to trace the evolution of the strikingly similar marks at the heart of this dispute. In the early 1980s, defendant Heagren owned half of the stock of Advanced Programming Resolutions, Inc. ("Old APR"), a company that placed employees in computer and data processing jobs and used the mark "APR" in connection with its services. Towards the end of 1986, Old APR entered an agreement to sell its stock to another company, AGS Information Services, Inc. ("AGS"). In December of 1988, after a two-year buyout period, AGS discontinued its use of the APR mark. During this period, Heagren worked for AGS, as did Charles Allard, who was hired as a comptroller. On January 31, 1989, Heagren incorporated a new company named Advanced Programming Resources, Inc. ("New APR"), yet continued to work for AGS. Heagren's activities with this new company lie at the heart of this dispute.

In 1993, Heagren and Allard learned that AGS was being sold to Keane, Inc. Charles Allard learned that his position with the company would not survive this transition and left AGS on December 1, 1993. Allard and his wife Linda Allard decided to create their own business that would refer employees with computer programming and data processing experience to potential employers. On January 20, 1994, they incorporated Allard Enterprises, Inc. and registered "Allard Programming Resources, Inc." as a trade name with the Secretary of the State of Ohio. Allard Enterprises unsuccessfully attempted to register the trade name APR, because APR was registered to AGS, via its successorship to Old APR. On April 29, 1994, Allard Enterprises was allowed to register the trade name "APR OF OHIO" with the Secretary of State of Ohio.

Heagren left Keane on May 13, 1994, and began working full time with New APR. At this time, he apparently believed, based on inaccurate advice from legal counsel, that New APR owned the rights to the trade name APR. On March 15, 1995, Heagren's attorney advised Charles Allard by letter that New APR considered Allard's use of the mark APR OF OHIO to infringe on New APR's protected use of the APR service

mark and demanded that Allard cease and desist from using its APR mark in the marketplace. In response, Allard Enterprises filed an application, dated March 30, 1995, with the United States Patent and Trademark Office for federal registration of its APR OF OHIO service mark, claiming that it first used the mark in connection with its services "at least as early as April 30, 1994." On March 31, 1995, Allard Enterprises responded to the March 15 letter from Heagren's attorney and denied that Heagren had any rights to the APR mark. On June 25, 1996, the Official Gazette of the Patent and Trademark Office published the APR OF OHIO mark, and on September 17, 1996, the service mark APR OF OHIO was registered to Allard Enterprises on the principal register of the Patent and Trademark Office.

Meanwhile, Heagren learned that the service mark APR actually was registered to AGS, not New APR. In response, Heagren and New APR unsuccessfully tried to register both the APR mark and the APR of Ohio mark with the Secretary of State of Ohio. On September 5, 1996, plaintiff brought this action in the United States District Court for the Southern District of Ohio. On September 24, 1996, plaintiff filed an amended complaint that alleged a claim of federal trademark infringement under 15 U.S.C. § 1114, a federal false designation of origin claim under 15 U.S.C. § 1125(a), a common law trademark infringement claim, an unfair competition claim, and a deceptive trade practices claim under Ohio Revised Code §§ 4165.01–4165.04. Defendants' answer to the amended complaint included a counterclaim alleging one count of false designation of origin under 15 U.S.C. § 1125(a), one count of common law service mark infringement, one unfair trade practices count, and one count of deceptive trade practices under state law. Both parties sought injunctive relief preventing the other from using its service mark.

Upon consent of the parties, the District Court referred the case to a United States magistrate judge for final disposition. After a bench trial, closing arguments, and post-trial briefs, the magistrate judge issued findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of

Civil Procedure. Because the parties stipulated that the marks APR and APR OF OHIO were confusingly similar, the central issue before the trial court was which party first used its APR mark in commerce. Although Allard Enterprises' application for federal registration of the APR OF OHIO service mark claimed that it first used the mark "at least as early as April 30, 1994," the court found that Allard Enterprises actually first used the service mark in commerce on March 30, 1994, when it sent out a mass mailing to 100 potential customers. It concluded, however, that Heagren had used the APR mark in commerce prior to that date.

The trial court supported this conclusion with findings of fact that chronicled Heagren's business activities after AGS abandoned the APR mark. It found that while Heagren was working for AGS, which was engaged in the placement of contract, or temporary, workers, he worked part-time for New APR, which was engaged in the placement of permanent workers. Although Heagren would have been prohibited from working independently in the contract employee placement business by an agreement not to compete with AGS, the court found that Heagren believed that he was not precluded from attempting to place permanent employees in the computer and data processing fields. It then identified several instances that showed Heagren used the APR mark when he solicited business for New APR from employers who might be interested in hiring permanent employees. The earliest of these came in 1991, when Heagren told Vincent Carter, who worked for AT & T, that he was doing permanent placements through New APR. This contact, however, did not lead to any business. In 1993 and 1994, Robert Sheehan, who had known Heagren since the 1970s, gave Heagren his resume and asked Heagren to help find him a job. In 1994, the Ohio Department of Liquor received Sheehan's resume from either New APR or Heagren, and eventually hired Sheehan.

Tom Norman testified that he contacted Heagren in 1993 seeking assistance in finding a new job. Heagren and Norman met at least twice and had approximately one dozen conversations regarding Norman's job search. The court found that Heagren contacted Riverside Methodist Hospital, WEC Engineering, and Blue Cross of Central Ohio on behalf of Norman, and arranged interviews for him at the first two of these potential employers. The trial court credited Norman's testimony that "when interviewed by WEC Engineering, ... the interviewer's copy of his resume bore the name 'APR.'"

According to the trial court's findings, Heagren also arranged interviews for Mike Greely, who previously worked for Old APR and AGS. Greely testified that he "saw [Heagren] in 1993, early fall of '93, while I was employed at the State, and we chatted briefly. And [Heagren] told me that he was doing permanent placement under APR, and I had asked him to help me find a permanent position at that time." Although Greely interviewed with Nationwide Insurance and a company called Highlights for Children, APR's efforts did not lead to a job offer. In 1993, Heagren also represented Richard Behrens, another employee of Old APR, in his search for a permanent job. Behrens produced a copy of his own resume with a header bearing the APR logo for Heagren to use in his job search. Heagren talked to a number of companies on behalf of Behrens, and Behrens testified that this resulted in two interviews. The trial court determined, however, that there was no evidence that Behrens' resume bearing the APR logo was ever distributed to a potential employer.

The court also noted that, in 1993, Heagren talked to Dwight Smith, who owned a small business named Sophisticated Systems, Inc. ("SSI"), which Smith could market to the State of Ohio as a minority-owned company. With this opportunity in mind, Smith and Heagren discussed the possibility that SSI could operate as a subcontractor to New APR in the permanent employee placement business. According to Smith's testimony, Heagren and Smith also discussed the opportunity for a similar subcontracting relationship for the placement of temporary employees between SSI and AGS. Smith testified, however, that it "was very clear" that New APR handled permanent employee placement and AGS handled contract employee

placement. Heagren provided Smith with the resume of at least one potential employee.

Finally, the trial court pointed to Heagren's dealings with a company named Lane Bryant. It found that "sometime in 1993 Heagren talked to Steve Stuthard, an executive with Lane Bryant, about Heagren's desire to place people in permanent positions at companies like Lane Bryant." Stuthard referred Heagren to the executive in charge of hiring, one Al Shutz, and the trial court found that "Heagren sent Shutz a fax on March 6, 1994 which referred to resumes which the two had discussed. The fax is on letterhead of Advanced Programming Resources, Inc., which uses the 'APR' logo in a distinctive fashion which had been designed by Heagren for use with old APR."

Although the court found no evidence that Heagren used the APR mark in any effort to recruit potential employees to satisfy employers, it concluded that "there is no question that he used the name APR in connection with his effort to find employers who had permanent vacancies to fill, and that he did so not only when he was presenting a resume of one of the people who called for assistance, but independently of those efforts. His contact with Steve Stuthard [at Lane Bryant] is a direct example of this type of business activity. To a lesser extent, his contacts with Dwight Smith [at SSI] and Vincent Carter [at AT & T] fall also into this category." After finding that Allard and Heagren each adopted the APR marks to capitalize on any remaining name recognition of Old APR, the court concluded that defendants' uses of the APR mark in connection with their permanent employee placement services were commercial and sufficiently continuous to establish his ownership rights in the mark prior to March 30, 1994. On that basis, the court concluded that defendants were entitled to permanent injunctive relief, and final judgment was entered on March 10, 1997.

On April 7, 1997, plaintiff filed a timely notice of appeal. On June 4, 1997, plaintiff filed a motion for clarification and relief from judgment under Rule 60(b) of the Federal Rules of Civil Procedure, arguing for the first time that defendants, without federal registration of the APR mark, were not entitled to nation-wide injunctive relief. The Magistrate Judge refused to reach the merits of plaintiff's Rule 60(b) motion, concluding that the timely filing of a notice of appeal transferred jurisdiction from the District Court to the Court of Appeals. We have jurisdiction under 28 U.S.C. § 1291.

## II. Discussion

On appeal, plaintiff argues that the magistrate judge erroneously concluded that defendants' marketing activities prior to March 30, 1994 established a bona fide use of the APR mark. In the alternative, plaintiff challenges the breadth of injunctive relief ordered by the court, asserting that defendants were not entitled to injunctive relief beyond the geographic area in which they actually had prior use of the APR mark. Defendants argue that their uses of the APR mark before March 30, 1994 were commercial, sufficiently continuous, and established their ownership of the mark. They also argue that plaintiff waived its right to challenge the geographic scope of the injunction by not raising that issue in the proceedings below. We address these issues in turn.

### A. Ownership of the APR Service Mark

■ At trial, the parties stipulated that the contested marks were confusingly similar and agreed that all of the state, federal, and common law claims in this case could be disposed of by determining ownership of the contested mark. The magistrate judge, recognizing that ownership rights in a service mark "flow only from prior appropriation and actual use in the market," *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1105 (6th Cir.1991), concluded that the entire dispute could be resolved by determining the priority of use of the trademark under the Trademark Act of 1946 ("Lanham Act"), codified as amended at 15 U.S.C. §§ 1051–1127 (1994). Although neither party on appeal addresses any of the claims under Ohio state law, "trademark claims under Ohio law follow the same analysis" that courts employ when consid-

ering analogous federal claims. *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 754 (6th Cir. 1998). Therefore, our review of the Lanham Act counts will determine the outcome of the service mark ownership dispute in this case.

■ This case includes two types of claims under the Lanham Act. Plaintiff asserted a claim of infringement under 15 U.S.C. § 1114,[1] and plaintiff and defendants each alleged a federal false designation of origin count under 15 U.S.C. § 1125(a).[2] These competing claims can be resolved with a single inquiry into who first used the APR mark. In federal trademark infringement claims under 15 U.S.C. § 1114, the "touchstone of liability ... is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997). The parties stipulated to that issue in the instant case, and our review focuses on whether the defendants can prove a prior continuous use of the mark and gain protection under the "innocent prior user" affirmative defense to infringement of a federally registered trademark. *See* 15 U.S.C. § 1115(b)(5); *Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1123–24 (6th Cir.1996). Turning to the second type of claims, the essential elements of a federal false designation of origin claim under 15 U.S.C. § 1125(a) are as follows:

(1) ownership of a specific service mark in connection with specific services; (2) continuous use of the service mark; (3) establishment of secondary meaning if the mark is descriptive; and (4) a likelihood of confusion amongst customers due to the contemporaneous use of the parties' service marks in connection with the parties' respective services.

*Homeowners Group, Inc.*, 931 F.2d at 1105. Because only the first two of these elements are at issue here, the competing false designation claims also will be resolved by determining the priority of use of the marks in question.

Plaintiff first challenges several of the lower court's findings of fact, and then argues that the magistrate judge misapplied the standard for determining what constitutes a legally sufficient prior use of a service mark. We consider plaintiff's challenges to the court's underlying factual findings before reviewing the court's legal conclusion that defendants established prior ownership of the APR mark.

### 1. Standard of Review

■ The determination of prior use of a service mark presents a mixed question of law and fact. We review the trial court's findings of fact for clear error, but review de novo the legal conclusion that defendants' prior use was sufficient to establish ownership of the service mark. *See, e.g., Champions Golf Club, Inc.*, 78 F.3d at 1116 (applying same two-tiered standard of review to ques-

1. Under 15 U.S.C. § 1114,
    (1) Any person who shall, without the consent of the registrant—
        (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive...
        ....
    shall be liable in a civil action by the registrant for the remedies hereinafter provided.
    15 U.S.C. § 1114(1).
2. In pertinent part, 15 U.S.C. § 1125(a) provides as follows:
    (1) Any person who, on or in connection with any goods or services ... uses in commerce

any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...
    ....
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1)(A).

tion of likelihood of confusion between two trademarks); *Martahus v. Video Duplication Servs., Inc.,* 3 F.3d 417, 421 (Fed.Cir. 1993) ("We review any factual findings underlying a priority determination for clear error.").

### 2. Findings of Fact

Plaintiff argues that the trial court made several erroneous findings of fact. First, plaintiff challenges the court's findings that defendants generated revenue in 1994 and that plaintiff did not receive revenue until June of 1994. These contested factual findings are irrelevant to our disposition of the question before us. Neither party challenges the lower court's conclusion that plaintiff first used the APR OF OHIO mark on March 30, 1994. Therefore, the pivotal question in this case is whether defendants used the APR mark in commerce before that date. Because it is undisputed that neither side to this dispute earned any revenue before that March 30, 1994, any factual error regarding when either party actually earned revenues is of no consequence to the priority determination in this case.

Plaintiff next argues that the trial court incorrectly found that companies in Ohio received written and oral communications in which the APR mark was used in association with the provision of permanent employee placement services by Heagren and New APR. This finding was not clearly erroneous. The record contained evidence of Heagren's use of the APR mark when he sent resumes and at least one fax to companies that did business in Ohio. Moreover, Steve Stuthard, an executive at Lane Bryant, testified that in 1993 and 1994 he associated the mark APR with Heagren, and considered Allard Programming Resources "a knock-off" of Heagren's company. Vince Carter, a supervisor of staffing at AT & T, testified that Heagren and New APR offered the placement of permanent employees during the relevant period, and that he associated APR with Heagren. Thus, there was evidence that companies doing business in Ohio received communications from Heagren that used the APR mark, and that they associated the name APR with Heagren.

Plaintiff also contends that the court failed to explain that Heagren's contact with Carter was on behalf of AGS and that Stuthard contacted Heagren at AGS. This argument is without merit. Both Carter and Stuthard testified that Heagren distinguished his association with APR and the placement of permanent employees from his connection with AGS and the placement of temporary employees.

Finally, plaintiff challenges the lower court's finding that Heagren announced his intention to operate New APR as a part-time business until he left Keane, arguing that whether or not Heagren announced an intent to use the mark is not relevant to the determination of whether he had established a prior use of the APR mark. Because the priority determination focuses on whether defendants established a bona fide prior use of the mark, as opposed to an intention to use the mark, we agree that the question of whether Heagren announced an intention to use the mark is irrelevant to our disposition of the case before us. *See, e.g., Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 504 (7th Cir.1992) ("[A]n intent to use a mark creates no rights a competitor is bound to respect."); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:11 (4th ed. 1997) ("The mere fact that a party conceived the idea of a trademark and discussed it with others does not establish priority as of the date of those events."). In sum, none of the contested findings of fact that were relevant to the disposition of this case were clearly erroneous.

### 3. Priority Determination

One of the bedrock principles of trademark law is that trademark or "service mark ownership is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market." *Homeowners Group, Inc.,* 931 F.2d at 1105. Allard Enterprises' federal registration of the APR OF OHIO service mark, however, serves as prima facie evidence of ownership and places on defendants the burden of showing their prior appropriation and continued use of their APR mark. *Id.* at 1105 & n. 2; *see also Zazu*

*Designs,* 979 F.2d at 504 ("Registration itself establishes only a rebuttable presumption of use as of the filing date."). Thus, we must determine whether defendants carried their burden of showing that their uses of the APR mark before March 30, 1994 were legally sufficient to establish prior ownership. Our analysis focuses on the meaning of the phrase "use in commerce."

In 1988, Congress passed the Trademark Law Revision Act of 1988 ("TLRA"), Pub.L. No. 100–667, 102 Stat. 3935 (1988), which amended the Lanham Act and redefined the term "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark." 15 U.S.C. § 1127. This section of the Lanham Act further provides that "a mark shall be deemed to be in use in commerce ... on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." *Id.* The Trademark Trial and Appeal Board ("TTAB") has explained that the purpose of this revision "was to eliminate 'token use' as a basis for registration, and that the stricter standard contemplates instead commercial use of the type common to the particular industry in question." *Paramount Pictures Corp. v. White,* 31 U.S.P.Q.2d 1768, 1774, 1994 WL 484936 (Trademark Tr.& App. Bd.1994), *aff'd,* 108 F.3d 1392 (Fed.Cir.1997) (Table). One commentator described the TLRA's revisions to the process of trademark registration as follows:

> Prior to 1989, in order to qualify for federal registration, the extent of actual use of the mark was irrelevant so long as it amounted to more than a mere sham attempt to conform with statutory requirements. However, effective November 16, 1989, Congress changed the statutory definition of "use" so as to require a greater degree of activity.

2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:8 (4th ed.1997) (footnote omitted). The revised Lanham Act, however, now allows an applicant to register a mark without claiming even a token use by showing that it has a "bona fide intention ... to use a trademark in commerce." 15 U.S.C. § 1051(b). The ap-

plicant then must file a statement of actual use within six months. *Id.* § 1051(d). Because an applicant may extend the deadline for filing the statement of actual use for up to twenty-four months, the Lanham Act now allows applicants to apply for registration of a mark two years before it is actually used in commerce. *Id.* § 1051(d). Contingent upon registration, the filing of an application to register establishes constructive use of the mark as of the date of filing. *Id.* § 1057(c).

We have explained these statutory revisions at length because plaintiff argues that the magistrate judge ignored these changes in the law and improperly analyzed this case under case law that antedated the revisions to the Lanham Act. We find no merit to this argument. The statutory definition of "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark," *id.* § 1127, and the accompanying explanation that a service mark the "shall be deemed to be in use in commerce ... when it is used or displayed in the sale or advertising of services and the services are rendered in commerce," *id.,* are entirely consistent with the traditional rules governing common-law ownership of trademarks. In the absence of registration, rights to a mark traditionally have depended on the very same elements that are now included in the statutory definition: the bona fide use of a mark in commerce that was not made merely to reserve a mark for later exploitation.

For example, in *Blue Bell, Inc. v. Farah Manufacturing Co., Inc.,* 508 F.2d 1260 (5th Cir.1975), the Fifth Circuit considered which one of two competing manufacturers first used the trademark "TIME OUT" in connection with men's clothing. Farah Manufacturing sold and shipped one pair of slacks bearing the mark to each of its regional sales managers on July 3, but did not ship clothing bearing the mark to customers until September. In an attempt to gain priority, Blue Bell attached the TIME OUT mark to clothes that were designed for, and were identified by, a different label. Blue Bell shipped the clothing bearing the two marks on July 5, but did not ship the line of clothing designed for the TIME OUT mark until October. In its oft-

cited opinion, the Fifth Circuit noted that common-law "ownership of a trademark accrues when goods bearing the mark are placed on the market," *id.* at 1265, and held that Farah's sale of clothes to its sales managers "was insufficiently public to secure trademark ownership," because "[s]ecret, undisclosed internal shipments are generally inadequate to support the denomination 'use.'" *Id.* It further explained that the phrase "bona fide use in trade" requires that the mark "be affixed to the merchandise actually intended to bear the mark in commercial transactions." *Id.* at 1267. The court found that Blue Bell's addition of the Time Out mark to items bearing the label of another line of clothes was not a bona fide use because it was intended to reserve the mark for the future, not to identify a particular line of goods. It concluded that the first bona fide use of the mark was Farah's public shipment of clothes that were labeled with and designed for the Time Out mark.

Some seventeen years later, in *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499 (7th Cir.1992), the Seventh Circuit engaged in a similar analysis when it considered which of two shampoo makers first used the trademark "Zazu." L'Oral applied to register the Zazu mark in June of 1986, and by August of that year had advertised and sold shampoo under that name across the nation. *Id.* at 501. In the previous year, a salon in suburban Chicago, named "Zaz Hair Designs" ("ZHD"), had begun developing a line of shampoo that it intended to bear the same mark. Between November of 1985 and February of 1986, ZHD sold some of its first samples to its customers and sold forty bottles to a hair stylist in Florida. The court found this latter shipment was "designed to interest the Floridian in the future marketing of the product line. These bottles could not have been sold to the public, because they lacked labels listing the ingredients and weight." *Id.* at 502. The *Zazu* court concluded that ZHD was "trying to reserve a mark for 'intended' exploitation. ZHD doled out a few samples in bottles lacking labeling necessary for sale to the public. Such transactions are the sort of pre-marketing maneu-

vers that ... cases hold insufficient to establish rights in a trademark." *Id.* at 505.

These two cases illustrate the longstanding principle that, in the absence of federal registration, prior ownership of a mark is only established as of the first actual use of a mark in a genuine commercial transaction.[3] *See, e.g., United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918) ("[T]he right to a particular mark grows out of its use, not its mere adoption...."); *Hydro–Dynamics, Inc. v. George Putnam & Co., Inc.,* 811 F.2d 1470, 1474 (Fed.Cir.1987) ("Subsequent adoption of the mark does not convert a shipment for the purpose of advisory consultation on the merits of a proposed trademark into a bona fide use of the mark in commerce."); *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1274 (2d Cir.1974) (holding that sales of perfume motivated by desire to preserve mark for later use were "insufficient to obtain enforceable rights in the mark"); *Paramount Pictures Corp.,* 31 U.S.P.Q.2d at 1775, 1994 WL 484936 (finding that applicant failed to make a bona fide use of his mark for board games in commerce because neither game nor its instructions were serious or genuine in nature and because applicant had "no real trade in games").

As long as there is a genuine use of the mark in commerce, however, ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition. As the *Blue Bell* court explained, "[t]he exclusive right to a trademark belongs to one who first uses it in connection with specified goods. Such use need not have gained wide public recognition, and even a single use in trade may sustain trademark rights if followed by continuous commercial utilization." 508 F.2d at 1265 (citations omitted). In an earlier case, the Fifth Circuit held that low volumes of door-to-door sales of metal and wood polish over a period of ten years were sufficient to establish priority, reasoning that "[t]he mere fact that a business is small and

---

3. In contrast, federal registration allows a registrant to claim constructive use of a mark as of the date of the filing for federal registration. *See* 15 U.S.C. § 1057(c).

its trade modest does not necessarily militate against its being an established business capable of acquiring goodwill and rights in a trademark." *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123 (5th Cir.1973). *See also Hydro–Dynamics, Inc.*, 811 F.2d at 1474 (recognizing that single bona fide shipment in commerce may support registration); *Kathreiner's Malzkaffee Fabriken v. Pastor Kneipp Medicine Co.*, 82 F. 321, 326 (7th Cir.1897) (holding that for rights in a mark to accrue,"[i]t is not essential that its use has been long continued, or that the article should be widely known, or should have attained great reputation"); *Bell v. Streetwise Records, Ltd.*, 640 F.Supp. 575, 580 (D.Mass.1986) (initial use of mark need not result in "instant success"); *E.I. Du Pont De Nemours & Co. v. Big Bear Stores, Inc.*, 161 U.S.P.Q. 50, 51 (1969) (finding that small volume of sales as part of test marketing plan were "sufficient to show a continuous use of the mark in question").

In other instances, however, courts have concluded that sporadic or minimal uses of a mark may indicate the mere intent to reserve a mark for later use rather than the present commercial utilization of the mark. For example, in *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265 (2d Cir.1974), the Second Circuit considered a perfume manufacturer that recorded eighty-nine sales of perfume bearing a particular trademark over a period of twenty years. The court concluded that it could not "agree [with the district court] that such a meager trickle of business constituted the kind of bona fide use intended to afford a basis for trademark protection." *Id.* at 1272. In contrast to other cases where protection was warranted because "the trademark usage, although limited, was a part of an ongoing program to exploit the mark commercially," *id.*, the court found that the low-level sales in this case indicated a mere desire to warehouse the mark for potential use at sometime in the future. It explained that " '[t]rademark rights are not created by sporadic, casual, and nominal shipments of goods bearing a mark. There must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade.' " *Id.* at 1274 (quoting *Clairol, Inc. v.*

*Holland Hall Prods., Inc.*, 165 U.S.P.Q. 214, 217, 1970 WL 9887 (1970)).

■■■■ On appeal, plaintiff discredits defendants' uses of the APR mark as part of a "word-of-mouth" marketing plan that targeted "personal friends," and asserts that such "secretive," "minimal," and "sporadic" uses are neither sufficiently commercial nor public to qualify as bona fide uses of a service mark. For the following reasons we disagree. First, we agree with the magistrate judge's finding that "whether or not this ... word-of-mouth or 'relationship' marketing is the preferred or optimal way to conduct this type of business, it is not so atypical that no reasonable person could view it as 'commercial.' " In contrast to the internal shipments and pre-marketing consultations that courts held inadequate in such cases as *Blue Bell, Inc.* and *Zazu Designs*, defendants in the case before us used the APR mark on at least one fax, on at least one resume, and in numerous other solicitations, as they offered New APR's services to several employers doing business in Ohio. Defendants were not engaged in "pre-marketing maneuvers," the disingenuous uses of a trademark, or the mere attempt to reserve the APR mark for later utilization. Defendants used the APR mark as they attempted to complete genuine commercial transactions, with the understanding that they would be paid if an employee was hired. Second, these commercial uses also were sufficiently public to qualify for protection. The use of a mark "need not have gained wide public recognition" to establish priority, *Blue Bell, Inc.*, 508 F.2d at 1265, and there was evidence in this case that several large companies that did business in Ohio identified the APR mark with Heagren and his permanent employee placement services. Finally, we find that defendants' use of the APR mark over the course of 1993 and into 1994 was consistent and continuous, if not high-volume. Defendants' "trademark usage, although limited, was a part of an ongoing program to exploit the mark commercially." *La Societe Anonyme des Parfums Le Galion*, 495 F.2d at 1272. For these reasons, we conclude that defendants established both the bona fide use in commerce of the APR mark before plaintiff's first use on

March 30, 1994 and the continuous use of that mark since then. Therefore, we affirm the trial court's determination that defendants established prior ownership rights to the APR mark.

## B. The Scope of the Injunction

After the magistrate judge determined that defendants were entitled to injunctive relief, the court issued the following order:

IT IS ORDERED AND ADJUDGED that pursuant to the Findings of Fact and Conclusions of Law as set forth in the Opinion and Order filed March 7, 1997, JUDGMENT is entered in favor of the defendants as follows: commencing on the date of receipt of that Order, plaintiffs are PERMANENTLY ENJOINED from continuing to use the mark "APR" or the mark "APR of Ohio" in connection with the business of placing temporary or contract computer-oriented personnel with employers.

After plaintiff filed its notice on appeal, it filed a motion for clarification and relief from judgment under Rule 60(b) of the Federal Rules of Civil Procedure. In that motion, plaintiff argued for the first time that its federal registration of the APR OF OHIO mark entitled it to use that mark in geographic regions in which the defendants had not established prior use of their confusingly similar mark. The magistrate judge concluded that plaintiff's notice of appeal divested the District Court of jurisdiction. On appeal, plaintiff reasserts its challenge to the geographic scope of the injunction, and defendants argue that plaintiff has waived its right to raise this issue before us by not raising it below.

Defendants' argument that plaintiff somehow waived its right to challenge the breadth of the injunction on its initial appeal is without merit. In other trademark cases, we have reviewed the breadth of injunctive relief ordered by lower courts, and there is no reason why we should not do so in this case. *See, e.g., Sovereign Order of Saint John of Jerusalem, Inc. v. Grady,* 119 F.3d 1236, 1241 (6th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998);

*Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889 (6th Cir.1991).

Plaintiff argues that the court's order in this case lacks the specificity required by Rule 65(d) of the Federal Rules of Civil Procedure because it fails to define the geographic scope of the injunction. Rule 65(d)provides that "[e]very order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." The Supreme Court has emphasized that "the specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974).

The problem with the order in this case is not really one of specificity. The order provides that "plaintiffs are permanently enjoined from continuing to use the mark 'APR' or the mark 'APR of Ohio' in connection with the business of placing temporary or contract computer-oriented personnel with employers." This language clearly forbids plaintiffs from any use of these marks and provides adequate notice of the proscribed conduct. The true deficiency of the order in this case is that it lacks the requisite findings to support such a nation-wide injunction, creating a real risk that the injunction proscribes an overly broad range of conduct. *See Southern Ohio Coal Co. v. United Mine Workers of America,* 551 F.2d 695, 705 n. 11 (6th Cir. 1977) (describing analytical difference between concepts of overbreadth and vagueness as applied to injunctions).

In the instant case, defendants claim only common law trademark rights, while plaintiff obtained federal registration of its mark. Under 15 U.S.C. § 1072, plaintiff's federal registration provides constructive notice of its ownership of the mark. As we noted above, under 15 U.S.C. § 1057(c), the owner of a federally registered mark may claim constructive use of that mark as of the date

of filing of the application for registration. Under this statutory scheme, defendants' rights to its mark extend only as far as the area where its continuous prior use of that mark preempted plaintiff's constructive use of its mark. *See* 15 U.S.C. § 1115(b)(5).

We explained this allocation of regional trademark rights in *Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.,* 477 F.2d 150, 157 (6th Cir.1973), where we stated that "[w]hile Dan Dee [the junior user] had a right to use the mark in the six state area of use prior to the registration by Old Dutch pursuant to the 'good faith prior user' defense of 15 U.S.C. § 1115(b)(5), it did not have the right to use the mark in any other area in the nation." In a more recent case, *Champions Golf Club, Inc. v. Champions Golf Club, Inc.,* 78 F.3d 1111, 1123–24 (6th Cir.1996), we further explained that this defense is available only if the following three elements are satisfied:

> (1) that the junior user ... adopted its mark before the senior user's ... registration under the Lanham Act, and without knowledge of the senior user's prior use; (2) that the trade area in which the junior user used the mark prior to the senior user's registration was limited in extent; and (3) that the junior user has continuously used the mark in the preregistration trade area.

*Id.* at 1124. As we remanded that case, we instructed the district court that it "must make a finding defining the trade area, if any, where [the junior user] continuously used the mark prior to [the senior user's] registration." *Id.*

These cases make it clear that Allard Enterprises retained the right to use its mark in those geographic regions that defendants had not entered at the time of Allard Enterprises' federal registration. The court's order in this case, however, issued an injunction of national scale without setting forth the geographic scope of defendants' trade territory. Therefore, we find that the court's order fails to "set forth the reasons for its issuance" and runs afoul of Rule 65(d). Moreover, the record in this case provides inadequate evidence for us to gauge the geographic range of defendants' prior use of the mark. For these reasons, we vacate the injunction and remand this case to the District Court for further proceedings. The District Court first should make factual findings defining the region where defendants continuously used their APR mark before plaintiff's registration, and then should issue an order granting the appropriate scope of injunctive relief.

### III. Conclusion

For the foregoing reasons, we affirm the trial court's determination that defendants established their prior use of the service marks at the center of this dispute, vacate its order granting injunctive relief, and remand this case for further proceedings consistent with this opinion.