RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0019P (6th Cir.)
File Name: 04a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

ANTHONY J. DEGIDIO,
    *Plaintiff-Appellant,*

    *v.*

WEST GROUP CORPORATION;
THE THOMSON
CORPORATION; WEST
LICENSING CORPORATION,
    *Defendants-Appellees.*

No. 02-3739

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 99-07510—David A. Katz, District Judge.

Argued: December 5, 2003

Decided and Filed: January 14, 2004

Before: KENNEDY, MARTIN, and MOORE, Circuit
Judges.

————————

## COUNSEL

**ARGUED:** Anthony J. DeGidio, Jr., Toledo, Ohio, for
Appellant. Robert L. Raskopf, WHITE & CASE, New York,

New York, for Appellee. **ON BRIEF:** Anthony J. DeGidio,
Jr., Toledo, Ohio, for Appellant. Robert L. Raskopf, Jennifer
Johnson Millones, WHITE & CASE, New York, New York,
for Appellee. Richard M. Kerger, KERGER & KERGER,
Toledo, Ohio, for Appellee.

    KENNEDY, J., delivered the opinion of the court, in which
MARTIN, J., joined. MOORE, J. (pp. 15-17), delivered a
separate opinion concurring in part and concurring in the
judgment.

————————

## OPINION

————————

    KENNEDY, Circuit Judge. Plaintiff appeals the district
court's order granting summary judgment to Defendants.
Plaintiff DeGidio argues that the district court erred when it
determined that his mark, LAWOFFICES, was descriptive
and that it had not acquired secondary meaning. We affirm.

## BACKGROUND

    This case represents an attempt by Plaintiff, Anthony
DeGidio, to obtain trademark protection for the mark
LAWOFFICES.[1] Plaintiff is the registrant of the domain

---

[1] Although the specific facts of this case involve the designation
LawOffices.net, as Plaintiff points out, the ".net" has no trademark
significance. Appellant Br. at 11 (quoting The Patent and Trademark
Office Examination Guide No. 2-99 (Sept. 29, 1999) (noting that when a
trademark "is composed, in whole or in part, of a domain name, neither
the beginning of the [Uniform Resource Locator] (http://www.) nor the
TLD [top-level domain] have any source indicating significance. Instead,
those designations are merely devices that every Internet site provider
must use as part of its address.") So Plaintiff is really seeking to
trademark LAWOFFICES. This would affect those practitioners who
have and who will seek to set up their practice as "Law Office[s] of
[Individual's Name.]"

name "lawoffices.net" and alleged founder and owner of the corresponding website,[2] which provides a directory of forty attorneys, legal information relating to cyberlaw issues, a vanity e-mail service,[3] listing of domain names for sale,[4] and a hosting service for legal related websites. Plaintiff, however, does not own either a federal or state registration for the LawOffices.net designation.[5]

Defendants, West Group Corporation, The Thompson Corporation, and West Licensing Corporation, utilize the designation *Law*office.com[6] and the domain name

---

[2] Plaintiff registered the domain name on January 25, 1996 and began the creation of the website in February of 1996.

[3] Vanity e-mail is a service whereby an individual could obtain an e-mail address with "@lawoffices.net" after the individual's name (e.g. smith@lawoffices.net).

[4] Domain names is a service whereby a person can set up a website with ".lawoffices.net" at the end (e.g. smith.lawoffices.net).

[5] The essential features of Plaintiff's putative trademark are: (1) a capitalization of "l" and "o;" (2) pluralization of "lawoffice;" and (3) placement of the term "LawOffice.net" in black font in a horizontal rectangular box that is shaded in marbled white and light gray.

[6] The essential features of Defendant's designation are: (1) captialization of the letter "l" only; (2) singular, as opposed to plural, "lawoffice;" (3) italicization of "law;" (4) placement of *Law*office.com in white font in a dark blue rectangular box; (5) a multi-colored open door emblem situated over the "dot;" and (6) the text "from West Legal Directory" place in smaller white font beneath *Law*office.

---

"lawoffice.com"[7] to market the West Legal Directory, which serves as an online resource for various legal information.[8]

Plaintiff filed this trademark action on August 24, 1999 alleging violations of the Ohio Deceptive Trade Practices Act, OHIO REV. CODE ANN. § 4165.01 *et seq.* (Count I); unauthorized use of trademark pursuant to OHIO REV. CODE ANN. §1329 *et seq.* (Count II);[9] common law unfair competition (Count III); false designation of origin under 15 U.S.C. § 1125(a) (Count IV); federal trademark dilution (Count V); common law dilution (Count VI); and the tort of misappropriation (Count VII). Both parties moved for summary judgment. The district court found that LAWOFFICES was not a protectible mark because it was descriptive and it had not acquired a secondary meaning. Accordingly, the district court granted Defendants' motion for summary judgment as to counts I-VI, but not VII. Plaintiff dismissed count VII and thereafter timely appealed.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo. Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996). In deciding a summary judgment

---

[7] Visitors to lawoffice.com are redirected to a Findlaw directory page at http://directory.findlaw.com.

[8] The website offers information on over four hundred legal topics, a directory of approximately 1 million attorneys and other legal professionals, an online searchable legal dictionary, and a frequently asked questions section. West also offers fee-based services, such as e-mail, website creation and hosting, and sponsorship packages. None of the fee-based services, however, are advertised at the *Law*office.com website.

[9] As the district court noted, Plaintiff has withdrawn Count II because in order to sustain a cause of action in Count II, a plaintiff must own a *registered* trademark, OHIO REV. CODE ANN. § 1329.66, and Plaintiff in the present case does not.

motion, this court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We view the evidence and draw all "justifiable inferences" in the light most favorable to the non-movant. *Id.* Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson*, 477 U.S. at 247-48 (emphasis in original). Mixed questions of law and fact are reviewed *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (*en banc*).

## ANALYSIS

As the district court correctly noted, in order to prevail on any of the first six counts, Plaintiff must establish that the designation "LawOffices.net" is indeed a valid and legally protectable trademark. *See DeGidio v. West Group Corp.*, No. 3:99 CV 7510, slip op. at 6-7 (N.D. Ohio Mar. 18, 2002) (citing *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 308 (6th Cir. 2001), *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 819 (4th Cir. 2001); *Sunbeam Products Inc. v. The West Bend Co.*, 123 F.3d 246, 251 (5th Cir. 1997), *overruled in part on other grounds sub nom., Traffix Devices, Inc. v. Mktg. Displays Inc.*, 532 U.S. 23 (2001)) The district court also correctly noted that the Lanham Act offers protection against infringement of both registered and unregistered marks. *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). To determine whether an unregistered mark is entitled to protection under § 43(a), the courts look to the general principles qualifying a mark for registration under § 2 of the Lanham Act. *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 921 (6th Cir. 2003) (citing *Two Pesos*, 505 U.S. at 768). As this Court has previously indicated, we employ the same analysis to alleged trademark violations under Ohio law, as

we do under the federal law. *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 354-55 (6th Cir. 1998); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 n. 2 (6th Cir. 2002); *Laventhal & Assoc., Inc. v. Thomson Cent. Ohio*, 714 N.E.2d 418, 423 (Ohio Ct. App. 1998). Finally, the same federal trademark principles apply to analogous federal and state common law claims. *Daddy's Junky Music v. Big Daddy's Family Music*, 109 F.3d 275, 288 (6th Cir. 1997).

As the district court observed, "whether Plaintiff's mark qualifies for trademark protection is determined by where the mark falls along the established spectrum of distinctiveness." *DeGidio*, No. 3:99 CV 7510, slip op. at 9-10 (citing *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir. 1993)). Putative trademarks may either: (1) be inherently distinctive or (2) acquire distinctiveness through secondary meaning. *See Two Pesos*, 505 U.S. at 769. Professor McCarthy, in his treatise, further explains that:

> Within the two basic categories are sub-categories that form the complete spectrum of distinctiveness of marks. Arrayed in an ascending order roughly reflecting their eligibility to trademark status and the degree of protection afforded, the categories are: (1) generic terms; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful. Generic terms can never be trademarks, descriptive terms are not inherently distinctive and suggestive, arbitrary and fanciful terms are regarded as being inherently distinctive.

2 McCarthy on Trademarks and Unfair Competition § 11:2 (4th ed. 2003). *See also Induct-O-Matic Corp. v. Indoctotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984).

In the present case, neither party is arguing that Plaintiff's mark is either generic or arbitrary or fanciful. Because suggestive marks are inherently distinctive, whereas descriptive marks can only acquire distinctiveness through

secondary meaning, we first consider into which sub-category, Plaintiff's mark falls.

## 1. **Plaintiff's mark is descriptive**

"A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Induct-O-Matic*, 747 F.2d at 362. As this Circuit explained earlier, examples of a suggestive term include "CITIBANK, which connotes an urban or modern bank, or GOLIATH, for wood pencils, connoting a large size." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996). On the other hand, a trademark is merely descriptive if it describes one, or more, of the following: "the intended purpose, function or use of the goods. . .the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir. 1988). As the *Champions Golf Club* court explained, "examples of descriptive marks are BEST, SUPERIOR, and PREFERRED." *Champions Golf Club*, 78 F.3d at 1117.

The district court found that Plaintiff's mark was, at best, descriptive. *DeGidio*, No. 3:99 CV 7510, slip op. at 16. To aid in its determination, the court relied on a following six-factor test that was articulated by Professor McCarthy[10] and accepted by the parties:

(1) How much imagination on the buyer's part is required in trying to cull a direct message from the mark

---

[10]Professor McCarthy developed the test to assist lawyers and judges in distinguishing between descriptive and suggestive marks because "the descriptive-suggestive dichotomy [is not] some kind of concrete and objective classification system. It is no more objective and free of personal predilections that a test which asks persons to divide all color shades into 'light' and 'dark.'" 2 McCarthy § 11:71.

about the quality, ingredients or characteristics of the product or service? In doing this, it must be kept in mind that the ordinary consumer does not spend much time in the marketplace lingering over such problems. On the other hand, if the potential buying class at issue are experts or professionals, a more critical examination is reasonable.

(2) Does the mark directly convey a real and unequivocal idea of some characteristic, function, quality or ingredient of the product or service to a reasonably informed potential buyer? That typical buyer will already have some knowledge about the product or service and is neither an expert nor a totally uninformed about the product. Is some reflection or multi-stage reasoning process necessary to cull some direct information about the product from the term used as a mark?

(3) Does the mark so closely tell something about the product or service that other sellers of like products would be likely to want to use the term in connection with their goods? Perhaps a more realistic way to pose this question is to ask whether, without any prior knowledge of this mark, others would be likely to want to use it to describe their products?

(4) Are, in fact, other sellers now using this term to describe their products? Even if the mark is descriptive and has attained secondary meaning, if many others in other product markets are using this term, the mark may be labelled [sic] "weak" and entitled only to narrow protection.

(5) Even though the mark may tell something about the goods or services, is it just as likely to conjure up some other, purely arbitrary connotation? E.g., SUGAR & SPICE baked goods, or POLY PITCHER plastic pitchers.

(6) How does the mark fit into the basic concept that descriptive marks cannot pinpoint one source by identifying and distinguishing only one seller? That is, are buyers

likely to regard the mark really as a symbol of origin, or merely as another form of self-laudatory advertising?

2 McCarthy § 11:71.

Plaintiff raises a number of arguments challenging the district court's holding. We find them to lack any merit. Ordinarily, we review the district court's classification of a term as "descriptive" or "suggestive" under the clear error standard. *See, e.g., Sands, Taylor & Wood Co. v. The Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir. 1992); 2 McCarthy § 11:3 (citing 1st, 2nd, 3rd, 4th, 5th, 7th, 8th, and Federal Circuits). However, as the Seventh Circuit noted, a grant of a summary judgment motion on the question of whether the mark is descriptive or suggestive, even resolving all factual disputes in favor of a non-moving party, amounts to a legal conclusion. *The Quaker Oats Co.*, 978 F.2d at 952. This legal conclusion is reviewed *de novo*. *Id.* *See also Eisenmann Corp. v. Sheet Metal Workers Int'l Ass'n Local No. 24*, 323 F.3d 375, 380 (6th Cir. 2003).

First, Plaintiff argues that the district court erred when it concluded that "LAWOFFICES was merely descriptive of an online database of attorneys and the electronic publication via a global network of computers" because, according to Plaintiff, there is no "law office that provides a software based service by which the attorney can enter their name, contact information, and specialty, into a database made available to individuals around the world and which is searchable by those users by the attorney's name, state, or specialty." Appellant Br. at 17-18. Plaintiff misses the mark on this argument. When potential clients think of the services that one would obtain from a lawyer in a law office, they certainly envision referrals to specialists, advice on lawyers in other jurisdictions, and other legally-related advice. The fact that Plaintiff (and Defendant) can now provide the same

service without a client actually going to a physical office does not change the meaning of the term "law office."[11]

Second, Plaintiff argues that the district court should have concluded that "LAWOFFICES was suggestive and therefore a trademark for domain name sales (an online searchable database of domain names for sale), website hosting (and third level domain name creation and sales), and the provision of vanity email services." Appellant Br. at 18. Although we find that the district court did not necessarily view evidence in light most favorable to Plaintiff when it applied the six-factor McCarthy test,[12] we nevertheless uphold the district court's opinion. The district court found that the second factor weighed in favor of Plaintiff. It also found that factors three through six weighed heavily in favor of Defendant. Since the descriptive-suggestive distinction is a continuum, we find that, even if we view the evidence in the light most favorable to Plaintiff, the mark LAWOFFICES lies very close to the descriptive end of a continuum.

---

[11] Plaintiff in his reply brief takes "issue with the finding that one typically would find a law office which provides to the public the service of searching for other attorneys or a service that publishes law articles and decisions to the public." This statement is baffling because, to the best of this Court's knowledge, attorneys routinely provide references to other attorneys, as well as provide their clients with copies of relevant law articles and court decisions. The fact that Plaintiff chooses not to charge the public for the provision of these services may make him a good person, but it does not entitle him to trademark protection.

[12] With regard to the first factor, the district court noted that "there is not a high degree of imagination that a typical buyer must employ to imagine the nature of Plaintiff's services, particularly in light of the sophistication level of the attorneys and other consumers likely to utilize such a website." *DeGidio*, No. 3:99 CV 7510, slip op. at 14. Had the district court found that after conducting a trial, we would not disturb that finding. We are troubled, however, by this conclusion at a summary judgment stage.

Finally, as Defendant points out, the main problem with Plaintiff's position is that Defendant in this case is not even accused of providing those services (i.e. domain name sales, website hosting, and vanity e-mail) on the website that allegedly infringed on Plaintiff's mark.[13] One can imagine a hypothetical case in which a defendant would provide services identical to Plaintiff's on a LAWOFFICE.COM website. That case would present an interesting question of whether "LAWOFFICES" is a suggestive or a descriptive mark with regard to those services. Since the present controversy does not involve such a fact pattern, we do not address the question of whether "LAWOFFICES" could ever be a suggestive mark.[14]

## 2. **Plaintiff's mark has not acquired secondary meaning.**

Since Plaintiff has failed to establish that his mark is suggestive, he must establish that the mark has acquired secondary meaning in the marketplace. "Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source." *Two Pesos*, 505 U.S. at 766 n.4 (citations omitted). Plaintiff

---

[13] As Defendant points out in its brief, "a retailer may not claim the word "Bicycle Shop" as a trademark for his bicycle store because he also sells soft drinks and candy under the "Bicycle Shop" brand. Because West does not list domain names for sale under its *Law*office.com mark, it does not infringe any supposed protectable element of DeGidio's designation." Appellee Br. at 17 n. 10.

[14] Plaintiff in his reply brief argues that "West's claims that there is no infringement were not addressed by the Trial Court because it found no mark rights. Any arguments as to infringement are not yet ripe for review and cannot be analyzed until one knows what services have been trademarked." Appellant Reply Brief at 3. We disagree. As stated above, our problem with Plaintiff's case is not the question of whether services have been trademarked, but a more limited problem that there is nothing in the record to support the claim that Defendant did any of the things that, assuming Plaintiff has a trademark, would amount to an infringement.

"must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs.*, 456 U.S. 844, 851 n. 11 (1982). As the district court noted:

> Courts in this Circuit evaluate seven factors to determine whether a mark has acquired secondary meaning: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 937 (6th Cir. 1999), *rev'd on other grounds*, 532 U.S. 23 (2001). "[I]t is the party seeking protection of a mark who bears the burden of proving that secondary meaning has attached." *Boston Beer Co.*, 9 F.3d at 182 (citing *Bristol-Meyers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2nd Cir. 1992); *Blinded Veterans Assoc. v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1041 (D.C. Cir. 1989)). "The evidentiary burden necessary to establish secondary meaning is substantial." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) Secondary meaning is established when a preponderance of the evidence demonstrates "that the attitude of the consuming public toward the mark denotes 'a single thing coming from a single source.'" *Id.* at 596 (quoting *Aloe Cream Labs. v. Milsan, Inc.*, 423 F.2d 845, 849 (5th Cir. 1970)). The best evidence of secondary meaning is direct evidence; however, such evidence is rarely available. *See id.*; *Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp.2d 700, 707 (N.D. Ohio 1999). Therefore, courts often draw inferences form the above factors. *See id.*

*DeGidio*, No. 3:99 CV 7510, slip op. at 17. The district court applied the seven-factor test and found that Plaintiff failed to

meet his burden with respect to establishing a secondary meaning for his mark. We agree.

First, with regard to consumer testimony, Plaintiff provided affidavits of three people who visited lawoffices.net website. The affidavits provide no testimony that affiants identify the website with a particular source of services. Mere use of a website does not equal identification with a particular provider. The district court also rejected as irrelevant the rankings by WebsMostLinked.com, a site that ranks websites based upon the number of other sites that link to them. We agree. Second, neither side has provided consumer surveys. Third, the district court found that, even assuming that length and continuity of use is favorable to Plaintiff, the wide use of the phrase "law office(s)" weighed against a finding of secondary meaning. *See, e.g., K'Arsan Corp. v. Christian Dior Perfumes, Inc.*, No. 97-1867, 1998 WL 777987, at *5 (6th Cir. 1998) ("Third-party use of 'sun powder' (by at least two, and as many as five, other companies...) weakens the mark.") (citing *Data Concepts Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 625 (6th Cir. 1998)); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir. 1980) (finding it significant that there was widespread third-party registration of "Domino"); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981) (finding 4400 businesses using "Sun" in their names to be "impressive evidence that there would be no likelihood of confusion between Sun Banks and Sun Federal.") Fourth, the district court found that Plaintiff's advertising expenditures of $2,500 over four years is woefully insufficient to establish secondary meaning. *See, e.g., Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (observing that "*extensive* advertising which results in consumer association with a single source" is needed to establish secondary meaning and finding that $100,000 in advertising expenses was not enough to establish secondary meaning without further evidence that such advertising was extensive or beyond necessary to survive in the market.) Fifth, the district court credited evidence that Plaintiff in four

years generated mere $200 in revenue from banner advertisements and click-through revenues. *Burke-Parsons-Bowlby*, 871 F.2d at 596 ($2,000,000 in gross sales is insufficient to establish secondary meaning). Sixth, neither side presented evidence regarding Plaintiff's market share. Seventh, Plaintiff failed to establish that Defendant intentionally copied Plaintiff's mark. At most, Plaintiff established that Defendant knew of Plaintiff's website. However, mere knowledge of the competitor's mark is insufficient as a matter of law to prove intentional copying. As the district court noted, "intentional copying...is not actionable under the Lanham Act absent evidence that the copying was done with the intent to derive a benefit from the reputation of another." *DeGidio*, No. 3:99 CV 7510, slip op. at 23 (citations omitted). Plaintiff's suggestion that Defendant wanted to derive a benefit from his minimal $50 annual business is meritless.

## CONCLUSION

In sum, we conclude that Plaintiff's mark is descriptive and that it has not acquired secondary meaning. Accordingly, we affirm the district court's decision.

---

## CONCURRENCE

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and concurring in the judgment. While I agree with the majority that DeGidio has failed to demonstrate that his mark has inherent or acquired distinctiveness warranting protection under the Lanham Act, I write separately to explain my conclusion that DeGidio's mark is merely descriptive rather than suggestive. I agree with the majority that the district court did not, as is appropriate on summary judgment, necessarily view all of the evidence in the light most favorable to DeGidio. I also agree that the district court's holding was nonetheless correct, but I reach that conclusion by a slightly different route.

We deal in this case with two sets of services: the domain name sales, web site hosting, and email hosting services ("internet services"); and the online attorney database and legal information database services ("database services"). I believe that "LawOffices.net" is clearly descriptive as to the provision of legal information and attorney references. With respect to the internet services, however, I read the factual record differently from the majority, for I believe that West is in fact "accused of" providing web site hosting and vanity email services on its web site. *See* Appellee's Br. at 7 ("West has also offered . . . e-mail and Web site creation and hosting services."). I think it is therefore necessary to inquire whether "LawOffices.net" is descriptive or suggestive as to those two internet services; although the internet services present a more difficult question, one the district court did not fully address, I nonetheless believe that "LawOffices.net" is descriptive as to these services as well.

While it seems settled that if we were to find that DeGidio had a protectable mark in "LawOffices.net," the difference

between the ".net" top-level domain ("TLD")[1] and the ".com" TLD on West's mark of "*Law*office.com" would not matter, *see* Patent and Trademark Office, "Examination Guide No. 2-99: Marks Composed, in Whole or in Part, of Domain Names" (Sept. 29, 1999), I believe that we can consider the entire mark as used by DeGidio when inquiring as to its distinctiveness. *See In re Anylens Acquisition, LLC*, Nos. 02-1493, 02-1494, 2003 WL 1194293, at *3 (Fed. Cir. Mar. 10, 2003) (noting a TLD can distinguish a particular type of organization from organizations associated with other TLDs); *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 271 (4th Cir. 2001) ("vw.net" only "confusingly similar" to "VW"). The TLD ".net" is short for "network," and originally was exclusively for use by network providers.[2] When DeGidio began LawOffices.net, he specifically chose a ".net" TLD because he planned to offer web site hosting services on his web site. *See* Joint Appendix at 98-100. I

---

[1] Each website has a corresponding domain name, which is an identifier somewhat analogous to a telephone number or street address. Domain names consist of a second-level domain — simply a term or series of terms (e.g., a2zsolutions) — followed by a top-level domain, many of which describe the nature of the enterprise. Top-level domains include ".com" (commercial), ".edu" (educational), ".org" (non-profit and miscellaneous organizations), ".gov" (government), ".net" (networking provider), and ".mil" (military).

*Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 691 (6th Cir. 2003) (citations omitted).

[2] Originally, the TLD ".net" was only available to network service providers, but according to one circuit, it was in September 1995 that the organization in charge of assigning TLDs stopped enforcing these distinctions. *See Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 266 (4th Cir. 2001). DeGidio claimed in his deposition testimony that ".net" was still restricted when he registered "LawOffices.net." If DeGidio is better informed than our sister circuit as to the precise date when ".net" ceased to be a restrictive TLD, it can only hurt his case that his mark is not descriptive.

would therefore hold that the mark "LawOffices.net" is descriptive as to the network services that DeGidio offered on his site, namely the web site hosting and vanity email services. *See, e.g., Eglen v. America Online, Inc.*, No. TH 00-135-C-M/H, 2003 WL 21508343, at *9-*10 (S.D. Ind. June 12, 2003) ("hometown.net" is descriptive as to local network service provider's services).

I therefore concur in Part 2 of the majority's opinion and in the judgment.