*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0384p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LEELANAU WINE CELLARS, LTD,

*Plaintiff - Appellant,*

*v.*

No. 06-2391

BLACK & RED, INC. and ROBERTA KURTZ,

*Defendants - Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 01-00319—Gordon J. Quist, District Judge.

Argued: July 17, 2007

Decided and Filed: September 20, 2007

Before: GIBBONS and SUTTON, Circuit Judges; BECKWITH, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Kenneth B. Morgan, MORGAN ASSOCIATES, PLC, Birmingham, Michigan, for Appellant. Thomas Richard Behm, GRUEL MILLS NIMS & PLYMAN, Grand Rapids, Michigan, for Appellees. **ON BRIEF:** Kenneth B. Morgan, K. Dino Kostopoulos, MORGAN ASSOCIATES, PLC, Birmingham, Michigan, for Appellant. Thomas Richard Behm, Brion J. Brooks, GRUEL MILLS NIMS & PLYMAN, Grand Rapids, Michigan, for Appellees.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. This case arose out of a trademark dispute between two Michigan wine producers: plaintiff-appellant Leelanau Wine Cellars, Ltd (LWC) and defendant-appellee Black & Red, Inc. (B&R), owned by defendant-appellee Roberta Kurtz. Following district court proceedings that resulted in an appeal to this court and a remand to the district court, the district court conducted a bench trial on LWC's Lanham Trademark Act, 15 U.S.C. § 1114, claim. Following the bench trial, the district court issued written findings of fact and conclusions of law in which it rejected LWC's claim that B&R's use of the mark "Chateau de Leelanau Vineyard and Winery" created a likelihood of confusion among consumers. The court entered judgment in favor of defendants-appellees, and LWC appealed.

_____

[*] The Honorable Sandra S. Beckwith, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

1

For the reasons below, we affirm the district court.

I.

In 1981, Michigan's Leelanau Peninsula was designated an Approved American Viticultural Area (AVA). 27 C.F.R. § 9.40. Federal regulation defines a "viticultural area" as a "delimited grape-growing region distinguishable by geographical features, the boundaries of which have been delineated . . . ." 27 C.F.R. § 9.11. An area's designation as an AVA permits the name of the area to be used as an "appellation of origin" on wine labels and in advertising.

Both LWC and B&R own and operate wineries located in the Leelanau Peninsula. LWC began operating its winery in 1977. In 1997, LWC successfully applied with the United States Patent and Trademark Office (USPTO) for registration of the mark "Leelanau Cellars" on the Principal Register. In 1990, Kurtz and Joanne Smart[1] formed B&R. B&R was initially devoted exclusively to growing fruit, including apples, cherries, plums, and grapes and, prior to 1999, sold its grape harvest to wineries, including LWC. In 1995, B&R received permission from the Michigan Department of Commerce to do business as "Le Coeur de Leelanau" and registered that entity as a vineyard and winery. In 1999, B&R, for the first time, utilized a part of its grape harvest to produce wine. B&R elected in 2000 to change the name Le Coeur de Leelanau to "Chateau de Leelanuau Vineyard and Winery." That same year, B&R received permission from the Bureau of Alcohol, Tobacco, and Firearms to sell wine. B&R began selling its wine in earnest in January 2001 and ceased its other fruit growing activities in 2005. During this period, B&R was aware of the existence of LWC and had been for approximately 20 years.

In October 2000, Michael Jacobson, the owner of LWC, directed a letter to Kurtz and Smart notifying them that their use of the word "Leelenau" as part of the name for their wine "infringes upon the exclusive rights we have to do business under the names Leelanau Wine Cellars, Ltd. and Leelanau Cellars." B&R continued to utilize the name, however, and ultimately applied for and received a trademark from the state of Michigan in November 2000. In October 2003, B&R successfully registered the name Chateau de Leelanau Vineyard and Winery on the Principal Register of the USPTO. Smart testified that B&R believed–after consultation with attorneys–that LWC was incorrect in asserting that it held the exclusive right to use the word "Leelanau" in its brand name.

On May 23, 2001, LWC filed suit against B&R, Smart, and Kurtz in the United States District Court for the Western District of Michigan. An amended complaint followed on September 28, 2001. The amended complaint raised two claims under the Lanham Trademark Act, 15 U.S.C. §§ 1114 and 1125, a claim for common law unfair competition, and a claim under the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901–445.922. On August 13, 2002, the district court issued a written order granting LWC's motion for partial summary judgment on the issue of liability on LWC's federal trademark claims and permanently enjoining B&R from using the term "Leelanau" in any trade or brand name for the sale of wine.[2] Following a two-day bench trial on August 28 and 29, 2002, on the issue of willfulness, the district court sent a letter dated October 11, 2002, to counsel, notifying them that it "probably erred" in granting summary judgment and a preliminary injunction to LWC. In light of the evidence at the bench trial, the district court explained, it was likely to rule that there was not a sufficient likelihood of confusion and rule in favor of B&R, but remained "open minded on the issue." The court issued an order November 21,

---

[1]Smart died in 2005.

[2]The court issued a subsequent order on September 4, 2002, stating that with regard to bottles of wine already bearing a Chateau de Leelanau label, B&R could merely affix an additional label notifying purchasers that Chateau de Leelanau was not affiliated with LWC.

2002, setting forth the bases for its belief that its previous ruling was incorrect. LWC sought the opportunity to conduct a consumer survey, and the court denied that motion. On February 14, 2003, the court entered judgment in favor of B&R, withdrew its August 13 order in favor of LWC, and lifted the previously imposed injunction against B&R's use of the word "Leelanau." LWC appealed to the Sixth Circuit on March 13, 2003. On appeal, a panel of our court affirmed the district court's power to reconsider its previous ruling unilaterally, but reversed and remanded with instructions to the district court to permit LWC to conduct its consumer survey.

On remand, the district court permitted LWC to conduct its desired consumer survey. On August 15, 2006, the court held a bench trial on the issues of liability and damages. The district court issued its findings of fact and conclusions of law on September 7, 2006. In its order, the court considered the admissibility of LWC's consumer survey, conducted by Dr. Sara Parikh. It found that the survey was potentially unreliable but nevertheless allowed its admission. On the central issue of the likelihood of consumer confusion, the court applied the eight-factor test used in the Sixth Circuit to evaluate trademark infringement claims. It concluded that LWC did not possess a strong mark and that, because B&R distributed its wine primarily through its tasting rooms, it was unlikely that consumers would have to distinguish between LWC wines and B&R wines or incorrectly associate the company's products. Accordingly, the court determined that LWC failed to carry its burden of showing a likelihood of confusion among relevant consumers and entered judgment on behalf of B&R. LWC filed a timely notice of appeal.

II.

Federal law provides:

(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a)–(b).

A.

Only those marks that are "distinctive" as a matter of law are accorded trademark protection. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002). Certain marks, described as "arbitrary," "fanciful," or "suggestive" are "inherently distinctive" and protectable.[3] *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). A so-called

---

[3]An arbitrary mark "has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 n.6 (6th Cir. 2005). A fanciful mark "is a combination of letters or

"generic" mark may never qualify for trademark protection.[4]  *Id.*  Between these two poles lie "descriptive" marks.[5]  Marks that are descriptive are not inherently distinctive but may enjoy the benefit of protection if they develop a "secondary meaning." *Id.* at 769; *Tumblebus*, 399 F.3d at 761.  This rule applies equally to phrases or terms that are "descriptive of the geographic origin of a product." *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 30 F.3d 348, 353 (2d Cir. 1994).  A descriptive mark achieves secondary meaning when "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982).  A geographically descriptive mark that has acquired secondary meaning "no longer causes the public to associate the goods [at issue] with a particular place but to associate the goods with a particular source." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 595 (6th Cir. 1989).

The district court deemed LWC's mark geographically descriptive, and the parties rightly do not contest the correctness of that determination, as it is not clearly erroneous, *DeGidio v. West Group Corp.*, 355 F.3d 506, 511 (6th Cir. 2004) ("Ordinarily, we review the district court's classification of a term as 'descriptive' or 'suggestive' under the clear error standard.").  "Where it is determined that the mark as perceived by potential purchasers describes the geographical origin of the goods the mark is primarily geographically descriptive." *Burke-Parsons-Bowlby Corp.*, 871 F.2d at 594; *see also Forschner Group, Inc.*, 30 F.3d at 355 ("A geographically descriptive term or phrase is one that designates geographical location and would tend to be regarded by buyers as descriptive of the geographic location of origin of the goods or services.") (internal quotation marks omitted).  The parties do, however, vigorously dispute whether LWC's mark possessed secondary meaning, entitling it to trademark protection.  Although B&R does not expressly challenge the validity of LWC's trademark, its claim that "LWC's descriptive trademark never attained a secondary meaning or incontestability" is, in fact, a challenge to the LWC mark's registration, and we address that issue first.

Registration of a mark on the Principal Register of the USPTO creates a rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law.  15 U.S.C. § 1115(a) (providing that registration on the principal register "shall be *prima facie* evidence of the validity of the registered mark . . . .").  Because LWC possesses a descriptive mark, its registration must have been on the basis of the USPTO's determination that its mark had obtained a secondary meaning.[6] *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001) ("Once a mark is registered, the Act affords a plaintiff one of two presumptions: (1) that her registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning.").  The effect of the statutory presumption contained in § 1115(a) is to shift the burden of

---

symbols signifying nothing other than the product or service to which the mark has been assigned." *Id.* at 761 n.7.  A suggestive mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Id.* at 761 n.5 (internal quotation marks omitted).

[4]"A generic term is one that is commonly used as the name of a kind of goods.  Unlike a trademark, which identifies the source of a product, a generic term merely identifies the genus of which a particular product is a species." *Tumblebus, Inc.*, 399 F.3d at 762 n.10 (internal quotation marks omitted).

[5]"A merely descriptive mark . . . is often said to identify a characteristic of the thing.  It is very similar to an adjective." *Tumblebus, Inc.*, 399 F.3d at 761 n.8 (internal quotation marks omitted).

[6]The parties have provided us with limited information concerning LWC's application process with the USPTO, but it appears that LWC received registration under 15 U.S.C. § 1052,  suggesting that the USPTO found the mark to be descriptive but with secondary meaning.

proof to the alleged infringer, in this case B&R, to prove the absence of secondary meaning. *See Burke-Parsons-Bowlby Corp.*, 871 F.2d at 593.

The district court's conclusion that LWC's mark had not acquired secondary meaning is reviewed for clear error. *See Ashland Oil, Inc. v. Olymco, Inc.*, No. 94-5520, 1995 WL 499466, *3 (6th Cir. Aug. 21, 1995). In its September 2006 ruling, the district court considered the secondary meaning question in the context of discussing the strength of LWC's mark. The court recognized that LWC's Leelanau Cellars mark was entitled to a presumption of secondary meaning under the Lanham Act. It went on to observe, however, that LWC actually sought a determination that "relevant consumers understand that the use of the term 'Leelanau' in connection with the sale of Michigan wine refers to LWC as the source of the wine rather than to the wine itself." It concluded that "[b]ecause 'Leelanau' alone is solely geographically descriptive and is not LWC's registered mark," the statutory presumption did not apply, "because there is no basis to conclude that the United States Patent and Trademark Office determined that 'Leelanau' alone had obtained secondary meaning in connection with LWC's use of LEELANAU CELLARS in its sales of wine." The district court's finding that LWC's mark was descriptive but lacking in secondary meaning should have ended its analysis, as a descriptive mark without secondary meaning is not entitled to trademark protection. *See Two Pesos, Inc.*, 505 U.S. at 769.

The district court erred in determining that LWC was not entitled to the benefit of a statutory presumption of validity because it did not register the word "Leelanau" alone. In *Burke-Parsons-Bowlby Corp.*, our court confronted a similar factual situation, where the holder of a registered trademark for the term "Appalachian Log Structures" sought to have Appalachian Log Homes, Inc. enjoined from the use of the phrase "Appalachian Log Homes." 871 F.2d at 592. There, the court deemed the trademark holder entitled to the statutory presumption of validity under 15 U.S.C. § 1115(a), despite the holder's failure to register the word "Appalachian" with the USPTO. *Id.* at 593. We believe that LWC was likewise entitled to the presumption afforded under § 1115.

LWC's mark has not achieved incontestable status, *see* 15 U.S.C. 1065,[7] and B&R was thus free to attempt to rebut the § 1115 presumption of secondary meaning. Having denied LWC the benefit of the presumption of secondary meaning, the district court failed to assess the evidence in the record to determine whether the presumption had been rebutted. We note that there is strong evidence in the record tending to undermine LWC's claim of secondary meaning. As the district court noted, the Leelanau Peninsula has been a federally-recognized wine-producing region since 1981. That designation has spawned the Leelanau Peninsula Vintner's Association (LPVA), consisting of 13 wineries, including Chateau de Leelanau and Leelanau Cellars. The government's recognition of the Leelanau Peninsula as a source of wine for more than 20 years as well as the existence of the LPVA would seem to undermine LWC's contention that "Leelanau" is necessarily associated with wine products coming from Leelanau Cellars. We ultimately decline to resolve this issue, as we think it outside our purview as an appellate court to weigh evidence never properly considered by the district court. However, as explained *infra*, we nevertheless affirm the district court's judgment on the ground that LWC has failed to demonstrate a likelihood of confusion created by B&R's use of its mark.

B.

"The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280

---

[7]Title 15, section 1065 provides that the right of a registrant to use a mark registered on the Principal Register shall be incontestable where the mark "has been in continuous use for five consecutive years subsequent to the date of registration" and is still used in commerce, provided that certain conditions are met. 15 U.S.C. § 1065.

(6th Cir. 1997). The Sixth Circuit utilizes an eight-factor test in ascertaining whether a likelihood of confusion exists:

> (1) strength of the senior mark;
> (2) relatedness of the goods or services;
> (3) similarity of the marks;
> (4) evidence of actual confusion;
> (5) marketing channels used;
> (6) likely degree of purchaser care;
> (7) the intent of defendant in selecting the mark; and
> (8) likelihood of expansion of the product lines.

*Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000). In applying these factors, the court has cautioned that they "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Group v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). Given the fact-specific nature of trademark infringement actions, not all of the eight factors will be relevant in every case. *See id.* In every case, "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.*

In reviewing the district court's decision on the issue of a likelihood of confusion following a bench trial, we examine any relevant factual findings for clear error. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 279. Whether a likelihood of confusion exists is a mixed question of law and fact subject to *de novo* review. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116 (6th Cir. 1996). That is, "the determination of what is the state of affairs regarding each factor is a finding of fact reviewed on the clearly erroneous standard, but the further determination of the likelihood of confusion based on those factors is a legal conclusion." *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 361 (6th Cir. 1984) (internal quotation marks omitted) (alterations in original).

1.

The strength of a mark is a factual determination of the mark's distinctiveness. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280. A stronger mark is accorded greater protection and encroachment upon a strong mark is deemed more likely to produce confusion among buyers. *Champions Golf Club, Inc.*, 78 F.3d at 1117. The district court deemed LWC's geographically descriptive mark to be weak because Leelanau is also the name of an AVA, rendering LWC's use of the word Leelanau in its mark unremarkable. LWC attacks this conclusion, citing its long-term use of the term "Leelanau" in its advertising, the success of its "Winter White" product, and the increase in its sales, going from approximately 30,000 cases in 2001 to nearly 70,000 cases in 2006. This evidence, while relevant to the question, is not sufficient to demonstrate clear error on the part of the district court. LWC possesses a descriptive mark, which is, in the spectrum of distinctiveness, weaker than an arbitrary or fanciful mark, for instance. *See Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280. In addition, the district court was correct that the federal designation of the Leelanau Peninsula as an AVA substantially decreased the possibility that a potential consumer would, upon seeing the mark, necessarily think of LWC's product.

LWC's reliance on our decision in *Wynn Oil Co. v. Am. Way Serv. Corp.* (*Wynn II*), 943 F.2d 595 (6th Cir. 1991), as support for its position that its mark is strong is inappropriate. There, the court considered the strength of a mark that was merely descriptive with secondary meaning and had become incontestable pursuant to 15 U.S.C. § 1065. LWC misreads *Wynn II* to state that "[a] trademark that is descriptive and has secondary meaning is a 'relatively strong' mark." In fact, *Wynn II* explains that "when a 'mark is incontestable, then it is presumed to be at least descriptive

with secondary meaning, and therefore a relatively strong mark.'" 943 F.2d at 600 (quoting *Dieter v. B&H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989)). LWC's mark does not qualify for incontestable status under § 1065, and, thus, LWC may not take advantage of the principle set forth in *Wynn II*.

2.

The Sixth Circuit evaluates the relatedness of goods by assigning the dispute in question to a place within a "tripartite system." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 798 (6th Cir. 2004). If the parties are in direct competition, "confusion is likely if the marks are sufficiently similar." *Id.* at 797. If the goods are "somewhat related, but not competitive," the likelihood of confusion determination will turn on one of the other seven factors. *Id.* If the products are unrelated, a likelihood of confusion is "highly unlikely." *Id.* "Services and goods are related not because they coexist in the same broad industry, but are related if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283-84 (internal quotation marks omitted).

B&R and LWC produce the same product in a shared geographical region. While there is very limited overlap in their distribution channels, as discussed *infra*, to the extent that their wines are sold in the same locations, they are in direct competition. Because B&R and LWC do not possess similar marks, however, this factor weighs against a finding of a likelihood of confusion.

3.

"Similarity of marks is a factor of considerable weight." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283. In assessing similarity, a court should consider the "pronunciation, appearance, and verbal translation of conflicting marks." *Id.*; *AutoZone, Inc.*, 373 F.3d at 795-96.

LWC urges the court to ignore the words "Cellar" and "Chateau de" in evaluating the similarity of the relevant marks. Discarding these elements in assessing similarity, however, would run contrary to the rule that courts must "view marks in their entirety and focus on their overall impressions, not individual features." *AutoZone, Inc.*, 373 F.3d at 795 (referencing "anti-dissection rule") (internal quotation marks omitted) (citing *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002)). LWC cites *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358 (6th Cir. 1984), in support of its proposed approach. However, the court there held, in assessing the similarity of the marks "INDUCTO"and "INDUCTO-O-MATIC," that "differences in spelling, number of syllables, the use of hyphens, and sound and visual appearance" were "slight and unlikely to prevent confusion." *Id.* at 361. In reaching this conclusion, the court did not dismiss substantial differences in the marks at issue, the effect of LWC's request. Moreover, the court did not set forth any rule establishing the more deconstructed approach LWC recommends.

Here, the similarities between"Leelanau Cellars" and "Chateau de Leelanau Vineyard and Winery" begin and end with the use of the word "Leelanau." While the remaining words in the marks are terms often associated with wine producing, they are different words, and part of the remainder of B&R's mark is in French. Further, B&R's mark contains far more syllables than LWC's. The marks are also visually dissimilar. The Chateau de Leelanau mark, which appears in italics, is accompanied by a cluster of grapes. LWC uses a number of images with its mark, which is composed of all capital letters. Many of those images depict nature scenes or ships. Despite the marks' shared use of the word "Leelanau," these differences are sufficiently significant to conclude that the marks are not so similar that they would produce a likelihood of confusion among purchasers. *See AutoZone, Inc.*, 373 F.3d at 795-96 (noting that competing marks had "some visual

and linguistic similarities, but ultimately their differences outnumber their similarities such that the likelihood of confusion is small").

4.

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Id.* at 798 (internal quotation marks omitted). On the issue of actual confusion, LWC, on remand from this court, produced a consumer survey conducted by Dr. Parikh at four malls throughout Michigan: two in Detroit, one in Grand Rapids, and one in Traverse City. In the study, interviewees were taken into a room and shown an advertisement for Leelanau Cellars wine. Interviewees were then asked to put the advertisement away and look at five bottles of Chardonnay, all of which originated in Michigan. The study included a "test cell" and a "control cell." The test and control cells both contained Turner Road, St. Julian, Wilhurst, and Zafarana wines. In the test cell, the fifth wine was Chateau de Leelanau. In the control cell, the fifth wine was Bel Lago. Participants in the study were, after viewing the advertisement and the wines, asked, "Do you believe there is *OR* is not a bottle of wine in this display that is the same as, or comes from the same source, that is, the same winery that puts out the wine in the advertisement that you just looked at?" Of those subjected to the test cell, 64 percent responded in the affirmative to the proposed question, and 54 percent identified Chateau de Leelanau as the wine they believed matched the ad. Of those who selected Chateau de Leelanau, 38 percent justified their belief on the basis of the use of the name "Leelanau" in both the Leelanau Cellars ad and on the Chateau de Leelanau bottle. Among the individuals who did not identify a match between the wine in the ad and a wine in the display, 10 percent nevertheless believed that there was a "relationship, sponsorship, or association" between the winery in the ad and the winery producing one of the bottles in the display. Eight percent of those individuals identified Chateau de Leelanau only as the associated wine. By contrast, only 31 percent of those individuals exposed to the control cell identified Bel Lago as coming from the same or a related source as Leelanau Cellars and reached that conclusion based on similarities in the labels. After adjusting her results for survey noise or guessing, Dr. Parikh concluded that, the "net confusion level" ranged between 27 percent and 31 percent.

The district court permitted the admission of the Parikh study, but refused to give Parikh's survey significant weight, citing three reasons: (1) the universe of respondents was overbroad and failed to include individuals who were potential purchasers of B&R's wines; (2) the survey did not replicate conditions that consumers would encounter in the marketplace; and (3) the survey questions were suggestive and misleading. These were legitimate bases for declining to rely heavily on the findings of the Parikh study. The district court correctly recognized that the study failed to limit the respondent population to those persons likely to purchase defendant's products. *See Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004) (stating that in a trademark infringement action where a survey is used, "the appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services") (internal quotation marks omitted). Although the study included adults who had or were likely to purchase a bottle of wine in the $5 to $14 price range, there was no attempt to survey only those people who would purchase moderately priced wines produced in the state of Michigan, undoubtedly a distinct group. Nor was the survey limited to wine purchasers who acquire wine through wine tasting rooms, the primary distribution source of B&R. The district court was also correct in concluding that the study failed to replicate actual market conditions. B&R sells its wines almost exclusively through its tasting rooms. Thus, it is unlikely that a purchaser of Chateau de Leelanau would find herself faced with the need to distinguish among various wines or, having walked into a B&R tasting room, erroneously believe that she was in fact at Leelanau Cellars.

These deficiencies undermine the persuasiveness of the Parikh survey. Where a survey presented on the issue of actual confusion reflects methodological errors, a court may choose to limit the importance it accords the study in its likelihood of confusion analysis. *See Borinquen Biscuit*

*Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 121 n.6 (1st Cir. 2006) (noting as to a consumer survey submitted in trademark litigation that the "small sample size and large margin of error combined to cast considerable doubt on its statistical integrity"); *Ashland Oil, Inc.*, 1995 WL 499466 at *4 ("It is the trial court's responsibility to determine the probative value of a consumer survey, and it is appropriate for the trial court to accord little or no weight to a defective survey."). The district court did not err in refusing to assign the consumer study presented by LWC considerable weight in its likelihood of confusion analysis. Because of its shortcomings, the Parikh study cannot serve as dispositive proof of the likelihood of confusion.

The remainder of LWC's evidence of actual confusion amounts to anecdotal accounts of confusion, lacking in detail and primarily offered in the form of hearsay at the bench trial. For example, Robert Jacobson, the son of Michael Jacobson, testified as follows: "[O]ne of our tasting room employees came out and said to me, 'Boy, that family that just drove away came in and said, 'Boy, they went into Chateau de Leelanau on their way here thinking it was Leelanau Cellars. And they were really upset about it." Jacobson also claimed that, on one occasion, the Leeland Business Association erroneously believed that LWC was participating in a food and wine festival, when, in fact, B&R was participating. The district court deemed these accounts *de minimis* and declined to afford them substantial weight. This conclusion was not in error. These stories lack the details necessary to establish actual confusion and are sufficiently few in number that they do little to support LWC's claim of actual confusion. *See Champions Golf Club, Inc.*, 78 F.3d at 1120 ("[F]our incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion.").

5.

Courts consider the respective marketing channels of the parties to a trademark infringement action to determine "how and to whom the respective goods or services of the parties are sold." *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006) (internal quotation marks omitted). There is less likelihood of confusion where the goods are sold through different avenues. *See id.*

There is very limited overlap between the distribution channels B&R and LWC utilize. B&R sells approximately 85 percent of its wine through its tasting rooms. Indeed, Kurtz testified that B&R wine almost "never leaves our tasting room." B&R does not sell to major retail operations. LWC, by contrast, sells 25 to 30 percent of its wines through its tasting rooms and the remaining 70 to 75 percent through retail stores like Sam's Club or Meijer's. Thus, despite their operation within a common geographical area, Chateau de Leelanau and LWC are sold, for the most part, in entirely distinct environments. This factor suggests a lesser likelihood of purchaser confusion.

6.

In assessing the degree of purchaser care, courts typically use a "typical buyer exercising ordinary caution" standard. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 285. When potential buyers possess special expertise or are sophisticated purchasers of the goods at issue, a higher standard is appropriate, and the likelihood of confusion decreases. *Id.* Similarly, purchasers of more expensive products are more likely to exercise care, thus reducing the possibility of confusion. *Id.*

LWC's argument on the issue of consumer care is that the wines at issue are relatively inexpensive and not unusual. Thus, purchasers of the parties' wines are typically making impulse buys and not exercising caution in selecting a wine. LWC is correct that the price of the wines at issue–less than $20 per bottle–suggests that potential buyers might exercise less care in selecting a wine. Moreover, to the extent that Leelanau Cellars and Chateau de Leelanau are distributed in

the same environments, it is likely the case that buyers exercise comparatively little care in selection and the likelihood of confusion is accordingly somewhat higher. However, the district court correctly noted that much of B&R's wine is sold through its tasting rooms, not retail channels. A purchase through a tasting room–often involving the process of tasting and comparing various types of wine–is a more deliberative process and would imply a greater level of consumer care in selection. One could accordingly assume that the likelihood of confusion would be reduced if not eliminated in such an environment.

The Sixth Circuit has explained that the purchaser care factor "often will depend upon its relationship with the other seven factors." *Id.* For instance, where marks are sufficiently similar, even a knowledgeable purchaser might incorrectly assume that he is purchasing the product of another party. *Id.* at 286; *Induct-O-Matic Corp.*, 747 F.2d at 364-65. In the instant case, however, the marks are not sufficiently similar that a careful purchaser, seeking out wine from B&R's tasting room, would incorrectly assume that it was in fact purchasing wine from LWC.

7.

The intent of the defendant in a trademark action is relevant because "purposeful copying indicates that the alleged infringer . . . believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286. Kurtz testified that B&R did not select its name in an attempt to benefit to LWC's detriment. Smart explained that she and Kurtz originally selected the name "Le Couer de Leelanau," or "the heart of Leelanau" in French, because of their winery's location in the Leelanau Peninsula, "where . . . the heart of Leelanau would be, right in the . . . upper center," and, because they believed the use of the word "le couer" was clever in light of Kurtz's work as a cardiologist. Kurtz and Smart decided to change the name after hearing it repeatedly mispronounced as "liquor" or "leaker" or "looker." Smart rejected the suggestion that the change was made with an eye toward creating confusion with LWC's mark or capitalizing on LWC's name recognition. Kurtz similarly denied any intent to attempt to take advantage of LWC's prominence among Leelanaue Peninsula wineries. In support of its claim of intentional misuse, LWC points to Smart's testimony that B&R knew that LWC "existed as a winery on the Leelanau Peninsula."

In light of this evidence, the district court did not erroneously conclude that B&R did not select its name in the hope of creating confusion with LWC's mark. Although Kurtz and Smart's awareness of LWC might, under different circumstances, demonstrate wrongful intent, *see id.*, their express denials of an effort to profit improperly from LWC's name recognition undermines this suggestion. LWC, for its part, makes no attempt to challenge B&R's representation that the name Chateau de Leelanau was chosen for both geographic and personal reasons and had nothing to do with an attempt to take advantage of LWC's name recognition.

Intent "is an issue whose resolution may benefit only the cause of the senior user, not of an alleged infringer." *Id.* at 287. Thus, this factor, although of no use to LWC, similarly does not accrue to B&W's benefit.

8.

A strong likelihood that the alleged infringer will expand its business to compete with a senior user will contribute to a finding of a violation. *Id.* Leelanau has conceded that this factor is not relevant to the present analysis. We agree that this record does not support any claim that B&R plans to increase the scale of its business and decline to weigh this factor in our analysis.

Having considered the foregoing factors, we conclude that LWC has not demonstrated that B&R's use of the mark "Chateau de Leelanau Vineyard and Winery" is likely to create an actionable

likelihood of confusion.  The district court correctly entered judgment on B&R's favor on that ground.

### III.

LWC also brought a Lanham Act claim for unfair competition under 15 U.S.C. § 1125. Because the success of an action under this section requires a showing that an alleged infringer's actions create a likelihood of confusion, the resolution of LWC's trademark infringement claim under § 1114 disposes of this claim. *See Champions Golf Club*, 78 F.3d at 1123.  LWC's state law claims for common law unfair competition and under the Michigan Consumer Protection Act fail for the same reason.  *See* Mich. Comp. Laws § 445.903(1)(a) (including among "unfair, unconscionable, or deceptive" trade practices "[c]ausing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services"); *Goscicki v. Custom Brass & Copper Specialties, Inc.*, 229 F. Supp. 2d 743, 756 (E.D. Mich. 2002) (stating that applicable standard under Michigan common law for unfair competition claim "is the same as the tests for federal trademark infringement and federal unfair competition").

### IV.

For the foregoing reasons, we affirm the judgment of the district court.