NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0663n.06
Case Nos. 08-2276, 09-1920

FILED
**Oct 28, 2010**
LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TENNECO AUTOMOTIVE OPERATING COMPANY, INC., | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| KINGDOM AUTO PARTS; PRIME CHOICE AUTO PARTS, | ) ) ) | |
| Defendants-Appellees. | ) ) | |

_____

BEFORE:  BATCHELDER, Chief Judge; MOORE and COOK, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge.  Plaintiff-Appellant Tenneco Automotive Operating Company, Inc. ("Tenneco") seeks reversal of the district court's grant of summary judgment to the Defendants-Appellees Kingdom Automotive Parts ("Kingdom") and Prime Choice Auto Parts ("Prime Choice") (collectively "Defendants") on Tenneco's trademark infringement and related claims and Defendants' declaratory counterclaim that Tenneco's product numbers are not protectable marks.  In this consolidated appeal, Tenneco also seeks reversal of the district court's denial of its motion for a preliminary injunction.  For the reasons herein we affirm the district court's orders.

**I.**

Tenneco and Kingdom are competitors in the strut assembly business.  Tenneco does business out of Illinois, while Defendants are both Canadian corporations with no United States sales

force. Both companies produce struts that are used to replace a car's original manufacturer's part, and the struts themselves are not covered by any patent or trademark protection. Tenneco markets its "Quick Strut" struts under the popular Monroe brand, and holds a registered mark in "Quick Strut." Defendants sell under the "StrutTEK" label.

Tenneco began using five-digit product numbers to identify its struts in 1983, and has registered several of those five-digit numbers with the United States Patent and Trademark Office ("USPTO"). In 2003, Tenneco added a sixth digit, a "1", to the beginning of its numbers. These numbers describe the strut they are assigned to and identify the vehicle the strut fits into. For product number 171994, for example, "1" indicates a strut assembly, "71" a particular model of strut, and "994" designates the car it is designed for, here a 2002 Ford Escort.

When Defendants prepared to enter the market, they sent one of Tenneco's struts to a Chinese manufacturer with instructions to copy it. In doing so, the manufacturer also copied the six-digit product number, which is stamped into the column of the strut directly beneath Tenneco's "Quick Strut" label. The product number was stamped into Defendants' struts in the same place, directly beneath Defendants' own "StrutTEK" label. Defendants accordingly used the stamped product number to identify their struts on their packaging and other materials.

Tenneco attempted to register the six-digit product numbers as trademarks with the USPTO, but was unsuccessful after several attempts. On June 16, 2008, the USPTO refused registration of "171994" and several other numbers, stating that "[r]egistration is refused because the applied-for-mark, as used on the specimen of record, merely identifies a model number; it does not function as a trademark to identify and distinguish applicant's goods from those of others and to indicate the

source of applicant's goods." The USPTO refused the applications again on July 31, 2008. On February 11, 2009, the USPTO seemingly reversed itself, declared the product numbers inherently distinctive, and approved them for publication and registration. The USPTO later withdrew this notice, however, determining that the assigned attorney had erred in approving the registration. On April 6, 2009, the USPTO reinstated the original refusals, commenting that the "evidence in the record overwhelmingly points to use of applicant's mark as a model or part number."

Tenneco filed a complaint against Defendants in January, 2008, and later filed a Second Amended Complaint. Tenneco alleged various violations of the Lanham Act, 15 U.S.C. §§ 1114, 1125, and Michigan's Consumer Protection Act, M.C.L. §§ 445.901 *et seq*., as well as tortious interference with prospective economic advantage from Defendants' allegedly unlawful use of Tenneco's product numbers and "Quick-Strut" mark.[1] Defendants filed a counterclaim for declaratory judgment that Tenneco's product numbers are not protectable marks.

Tenneco moved for a preliminary injunction to prevent Defendants from continuing with their allegedly infringing activities. The district court denied the motion and Tenneco filed an interlocutory appeal with this Court. While that appeal was pending the litigation continued below. After discovery, Defendants moved for summary judgment, which the district court granted on all counts but one. The parties stipulated to the dismissal of that count pending the result of this appeal and the district court entered final judgment. Tenneco now brings this timely appeal (No. 09-1920),

---

[1]Tenneco also made several other allegations which were disposed of on summary judgment and were not appealed. For the sake of clarity we have not recited those counts here.

which has been consolidated with the still-pending interlocutory preliminary injunction appeal (No. 08-2276).

Tenneco presses several arguments on appeal, contending that: the district court erred by finding that Tenneco did not claim its product numbers were inherently distinctive; the district court erred by finding that the product numbers had not acquired secondary meaning; the district court erred by finding that Defendants did not infringe on its Quick-Strut mark; and the preliminary injunction should have been granted. We address each argument in turn.

## II.

### A.        Jurisdiction and Standard of Review

We have jurisdiction over the appeal of summary and final judgment from the district court under 28 U.S.C. § 1291. We review the district court's grant of summary judgment *de novo*, *DeGidio v. West Group Corp.*, 355 F.3d 506, 509 (6th Cir. 2004), but review evidentiary findings for an abuse of discretion. *Snyder v. AG Trucking, Inc.*, 57 F.3d 484, 492 (6th Cir. 1995). On summary judgment the moving party has the burden to show that there are no genuine issues of material fact, and the evidence is read in the light most favorable to the nonmoving party. *DeGidio*, 355 F.3d at 509. Summary judgment is appropriate "if the pleadings, the discovery disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Summary judgment is appropriate where the nonmoving

party fails to make a showing sufficient to create a genuine issue of material fact regarding a matter on which the nonmoving party has the burden of proof." *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968 (6th Cir. 1991).

### B. Inherently Distinctive and Descriptive Marks—Applicable Law

Tenneco claims Defendants unlawfully used Tenneco's product number on Defendants' struts in violation of the Lanham Act, 15 U.S.C. § 1125(a), Michigan law, and common law. The elements of all these claims are the same, as is the analysis–failure under one is failure under all. *See Leelanau Wine Cellars, LTD v. Black & Red, Inc.*, 502 F.3d 504, 521 (6th Cir. 2007); *DeGidio*, 355 F.3d at 509–10; *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 604–05 (6th Cir. 1991).

The Lanham Act, 15 U.S.C. § 1051*, et seq.*, "was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992) (quoting 15 U.S.C. § 1127). The Act forbids "[a]ny person . . . [from] us[ing] in commerce any word, term, name, symbol, or device . . . which is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods . . . or in commercial advertising or promotion, misrepresent[ing] the nature, characteristics, qualities, or geographic origin of his or her . . . goods." 15 U.S.C. § 1125(a)(1). Any person who does so is "liable in a civil action by any person who believes that he or she is likely to be damaged by such act." *Id.* The Act protects against infringement of both registered and unregistered marks. *DeGidio*, 355 F.3d at 509.

"[W]hether Plaintiff's mark qualifies for trademark protection is determined by where the mark falls along the established spectrum of distinctiveness." *Id.* at 510 (internal quotation marks

and citation omitted). In increasing order of distinctiveness, the categories are (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *Two Pesos*, 505 U.S. at 768. "Generic" marks are given no protection, while the latter three types are "deemed inherently distinctive" because "their intrinsic nature serves to identify a particular source of a product" rather than merely the product itself. *Id.*; *see Leelanau*, 502 F.3d at 512–13. "Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected." *Two Pesos*, 505 U.S. at 769. Descriptive marks can only receive trademark protection if they have acquired secondary meaning. *Id.* If the mark has acquired secondary meaning, the infringer is only liable under the Act if the mark holder proves a "likelihood of confusion." *Id.*; 15 U.S.C. § 1125(a)(1).

"A descriptive mark achieves secondary meaning when 'in the minds of the public, the *primary significance* of a product feature or term is to identify the source of the product rather than the product.'" *Leelanau*, 502 F.3d at 513 (emphasis added) (quoting *Inwood Labs, Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 851 n.11 (1982)). Or, put another way:

> To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, "That is the article I want because I know its source," and not the negative inquiry into "Who makes that article?" In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it.

*Ferrari S.P.A. Esercizio Fabriche Auto. E Corse v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991) (hereinafter "*Esercizio*"). The best evidence of secondary meaning is direct evidence, but this is rarely available. *DeGidio*, 355 F.3d at 513 (citation omitted). When direct evidence is unavailable we draw inferences from the following factors to aid our determination: "1. direct consumer

testimony; 2. consumer surveys; 3. exclusivity, length, and manner of use; 4. amount and manner of advertising; 5. amount of sales and number of customers; 6. established place in the market; and 7. proof of intentional copying." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 311–12 (6th Cir. 2001). Tenneco has the burden of proof to show secondary meaning, and that burden is substantial. *DeGidio*, 355 F.3d at 513.

### C.    Findings Below

The district court found that Tenneco admitted that the product numbers are descriptive because the product numbers "are readily decoded into information regarding type of product." The district court then analyzed the seven factors listed above. For direct consumer evidence, the district court found that the 27 "Customer Declarations" proffered by Tenneco could not be considered by the court because they were neither sworn to in front of a notary nor made on personal knowledge. Furthermore, when Defendants tried to conduct discovery on the declarations they were "thwarted due to the alleged disappearance of documents and electronically stored information." The court noted that Tenneco has used the six-digit numbers since 2003 on its packaging, catalogues, and other printings. The court also found that the number is always accompanied by the "Monroe" mark, which identifies the source, while the number describes the product. Tenneco spent approximately $1.1 million dollars on advertising that included the product numbers, but the court found that there was no evidence presented that the advertising made the product numbers into source identifiers. On the last factor, the court found that, while Defendants did intentionally copy the strut itself, "intentional copying is not relevant" because this is not a trade dress case.

Finally, the court noted the USPTO's determination that the product numbers did not have secondary meaning, along with Defendants' expert Mr. Enborg's testimony coming to the same conclusion, and found that evidence persuasive. The district court held that there remained no genuine issue of material fact with respect to the issue of whether any secondary meaning existed in the product numbers, and granted Defendants' motion for summary judgment on the product number claims.

## D.    Inherent Distinctiveness

Tenneco argues that the district court erred in determining that Tenneco "waived" the question of inherent distinctiveness by declaring its product numbers descriptive. It further argues that because the USPTO found the product numbers to be inherently distinctive and then reversed itself, there is a genuine issue of fact on this question.

Tenneco is incorrect. The district court did not hold that Tenneco "waived" the argument, it merely noted that Tenneco itself admitted its product numbers were descriptive, which the record shows that Tenneco did do. Even if it was improper for the court to take such a statement as an admission, the burden is on Tenneco to prove its mark deserves protection. The fact that the USPTO, after repeatedly refusing to permit Tenneco to register the numbers, briefly found the product numbers inherently distinctive before subsequently reversing itself in emphatic fashion, not only does not support Tenneco's position but strongly undercuts it. Furthermore, these product numbers, which Tenneco admits are coded to identify the part, do not satisfy the tests for suggestive, arbitrary, or fanciful marks, nor does Tenneco offer any argument or proof that they do. Tenneco's conclusory statements are insufficient to raise a genuine issue of material fact on this question.

8

### E.      Secondary Meaning

Tenneco also contends that the district court improperly deemed irrelevant or ignored its evidence for secondary meaning, focusing on the first and final factors:  direct consumer testimony and intentional copying.  Tenneco claims that the court abused its discretion by refusing to consider 27 unsworn declarations, and erred by ignoring without comment three additional distributor declarations.  It also argues that the district court erred by declaring intentional copying to be irrelevant.

We begin by considering whether the district court improperly ignored or deemed irrelevant the evidence Tenneco has identified.  Even if there is any evidence that should have been considered below and was not, however, that evidence does not, on its own, raise a genuine issue of material fact.  Rather, that evidence must be considered along with the other factors as a whole to determine if any ultimate error occurred.  *See Herman Miller*, 270 F.3d at 315 (reversing the district court when a genuine issue of material fact remained on the question of secondary meaning only after considering all the factors together).

### 1.      Allegedly Ignored Evidence

#### a.      The 27 Unsworn Declarations

Rule 56(e)[2] requires district courts to rely on affidavits, discovery, and disclosure materials when ruling on a motion for summary judgment.  An affidavit "is required to be sworn to by the affiant in front of an 'officer authorized to administer oaths,'" *Peters v. Lincoln Elec. Co.*, 285 F.3d

---

[2]All references to the Federal Rules of Civil Procedure are to the rules in effect at the time of the orders below.

456, 475 (6th Cir. 2002) (quoting Blacks' Law Dictionary 54 (5th ed. 1979)), and must be made on the affiant's personal knowledge. Fed. R. Civ. P. 56. 28 U.S.C. § 1746 allows for unsworn declarations to take the place of affidavits, so long as those declarations are made "under penalty of perjury" and follow one of the statute's stated formulas. *Peters*, 285 F.3d at 475.

Summary judgment is appropriate where the nonmoving party fails to present admissible evidence to defeat the summary judgment motion. *Dole*, 942 F.2d at 968. In *Dole*, the defendants argued that the district court erred in granting summary judgment to the plaintiff when defendants introduced one affidavit based solely on hearsay and two unsworn statements that purported to undermine the plaintiffs' evidence. *Id.* The defendants claimed they should have been allowed to proceed to trial to prove that plaintiff's records were not accurate. We affirmed the district court, holding that the hearsay affidavit could not be considered and the unsworn statements "must be disregarded because a court may not consider unsworn statements when ruling on a motion for summary judgment." *Id.* at 968–69. "Summary judgment for the [plaintiff] was appropriate because defendants failed to present *admissible* evidence to defeat the [plaintiff's] properly supported motion for summary judgment." *Id.* at 968.

Regardless of the impact of Tenneco's failure to produce documentation regarding these declarations, it was not an abuse of discretion for the district court to refuse to consider the 27 unsworn declarations that were not clearly made on personal knowledge nor made under the penalty of perjury. The declarations are basically identical, and each states that the signatory "declares that all statements made herein of my own knowledge are true and that all statements made on information and belief are true." The documents, however, do not specify which statements were

made under information and belief and which were made from personal knowledge. As in *Dole*, the declarations are unsworn and were not made under the penalty of perjury. The district court, limited to admissible evidence on summary judgment, did not abuse its discretion by refusing to consider these declarations.

### b.     Three Distributor Declarations

Tenneco next points to declarations given by three of its distributors. These declarations state that each of the distributors personally associate the "171" product numbers with Monroe products based upon the distributor's industry experience. Each of the declarations is properly made under penalty of perjury and is admissible. None of the declarations contains any statements about what Tenneco's ultimate consumers believe. Tenneco argues that the district court improperly ignored these declarations and that they create a genuine issue of material fact. We find that the declarations are relevant, albeit weak, evidence of secondary meaning, and the district court erred by not considering them.

"Direct consumer testimony 'need not take the form of explicit testimony from consumers stating that "I care that X produced this product." ' " *Herman Miller*, 270 F.3d at 312 (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 294 (7th Cir. 1998)). The plaintiff in *Herman Miller*, Herman Miller, Inc., was the producer and copyright-holder of several world-famous furniture designs. *Id.* Herman Miller sued Palazzetti Imports for infringing the copyright of its famous Eames lounge chair and ottoman. The district court granted summary judgment for Palazzetti, and Herman Miller appealed. Herman Miller had no direct consumer testimony to prove secondary meaning, but relied on "a variety of circumstantial testimony indicating a link between

Herman Miller and the Eames lounge chair and ottoman in the mind of the consuming public for modern furniture." *Id.* The circumstantial evidence was both substantial and impressive, including affidavits and supporting evidence from historians, design experts, authors, past and present employees, and various celebrities who all associated the Eames lounge chair with Herman Miller. *Id.* We noted that in *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929 (6th Cir. 1999), *rev'd on other grounds*, 532 U.S. 23 (2001), this court relied on the testimony of former employees of both the plaintiff and defendant in the absence of direct consumer testimony in a trade dress claim. *Herman Miller*, 270 F.3d at 312 (citing *TrafFix*, 200 F.3d at 937). We found this evidence to be a factor in Herman Miller's favor, but not dispositive. We reversed the district court's grant of summary judgment only after analyzing all seven factors in the secondary meaning test and finding that Herman Miller had presented sufficient evidence of secondary meaning to create a genuine issue of material fact. *Id.* at 315 ("Taken together, Herman Miller has produced sufficient evidence to create a genuine issue of material fact . . . .").

Tenneco argues that this court should follow the Seventh Circuit's approach from *Thomas & Betts*, where that court found that the mark-holder's direct consumer evidence created a genuine issue of material fact. 138 F.3d at 294. There, the mark-holder presented declarations from "[f]our distributors and two consultants, all of whom have considerable experience in the electrical industry, [which] state unequivocally . . . that they recognize and associate the oval shape . . . with T & B." *Id.* The court found that because T & B sold its products primarily through distributors, the relevant class of consumers consisted of both ultimate consumers and dealers. The Seventh Circuit reversed

12

the district court's grant of summary judgment and held that these declarations created a genuine issue of material fact. *Id.*

Applying *Herman Miller* to the case before us, we find that the district court erred by not considering the three distributor declarations. In *Herman Miller*, the court considered volumes of circumstantial evidence assembled by the plaintiff, including affidavits from nonparty experts in the relevant field. The district court should have considered the declarations of the mechanics and distributors who have extensive experience in the industry. We decline, however, to find, following *Thomas*' approach, that the declarations create a genuine issue of material fact. While the court in *Herman Miller* did quote from *Thomas* in its discussion of direct consumer testimony, it did not cite to *Thomas*' holding, nor did it determine based on this factor alone that a genuine issue of material fact remained as to secondary meaning. Instead, the court analyzed all seven factors in the light of all the applicable evidence before coming to the conclusion that the district court had erred. *Herman Miller*, 270 F.3d at 315–16.

This conclusion is supported by our treatment of similar evidence in "likelihood of confusion" cases. In *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, the district court had rejected intermediate vendor testimony as irrelevant, but we reversed the court's grant of summary judgment, holding that evidence regarding "point of sale" consumers was not the only relevant evidence of confusion. 78 F.3d 1111, 1119 (6th Cir. 1996). Similarly, in *Esercizio* we found that the protections of the Lanham Act extended beyond preventing customer confusion at the point of sale. 944 F.2d at 1244. We have also held that the evidence of three or four selected individuals is insufficient to raise a genuine issue of material fact as to actual confusion.

13

*Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991).

In *Homeowners Group*, the district court granted summary judgment and we affirmed, finding that "the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference that no likelihood of confusion exists." *Id.*; *see also Leelanau*, 502 F.3d at 519 (finding a few stories from customers insufficient to demonstrate clear error after a bench trial); *Champions Golf*, 78 F.3d at 1120 (finding that "four incidents is not a considerable quantum of evidence of actual confusion"). These cases, together with *Herman Miller*, support the conclusion that the declarations are relevant, but very weak, evidence in Tenneco's favor. The declarations are insufficient by themselves to create a genuine issue of material fact.

### c.       Intentional Copying

The district court found Tenneco's evidence that Defendants copied Tenneco's struts to be irrelevant because this is not a trade dress case. Tenneco argues that the district court erred, and further argues that its evidence of intentional copying raises a genuine issue of material fact. Besides the copying itself, Tenneco points out that Defendants used the product numbers on their external packaging, labels, and packing slips. Tenneco characterizes this use as an "admission" of secondary meaning that consumers, or at least distributors, associate the numbers with Tenneco.

Defendants, apparently realizing the district court's error, attempt to recast the district court's language by arguing that the district court was distinguishing this case from the trade dress cases on the basis of what is being protected. Defendants also point out that the strut was not protected, that Tenneco themselves copied it from the original part, and that there is no evidence Defendants

14

instructed their Chinese contractor to copy the product number as well. As to the labels, Defendants argue that Tenneco's argument for an "admission" is overdrawn. Use of the product numbers as a cross-reference is common practice in the industry; furthermore, Tenneco offers nothing but its own gloss on the numbers to show that they point out the source rather than the product.

Tenneco is correct that the district court erred when it stated, apparently categorically, that because this was not a trade dress case the evidence of intentional copying was irrelevant. *See*, *e.g.*, *Two Pesos*, 505 U.S. at 773 ("[T]he protection of trademarks and trade dress under § 43(a) [of the Lanham Act] serves the same statutory purpose of preventing deception and unfair competition. There is no persuasive reason to apply different analysis to the two."); *Herman Miller*, 270 F.3d at 308 n.2 ("Trade dress issues follow the same rules and laws as trademark issues."). The district court should not have found Tenneco's evidence of intentional copying to be irrelevant because this is a trade mark case.

Tenneco's application of the trade dress cases to the present case, however, is flawed. "Trade dress refers to the image and overall appearance of a product." *Herman Miller*, 270 F.3d at 308 (internal quotation marks and citation omitted). The trade dress cases, including *Esercizio*, *Two Pesos*, and *Herman Miller*, all focus on the intentional copying of the relevant trade dress at issue, whether the Ferrari exterior, the restaurant appearance and atmosphere, or the lounge chair and ottoman. *See Esercizio*, 944 F.2d at 1239; *Two Pesos*, 505 U.S. at 765 n.1; *Herman Miller*, 270 F.3d at 314. The Supreme Court in *Two Pesos* and this Court in *Herman Miller* and *Esercizio* considered evidence of intent to specifically copy those protectable trade dress designs. These were broad inquiries because the idea of trade dress is broad and encompasses the whole scope of the product.

Here, however, the product itself is not protected. Tenneco seeks protection only for the product number. Defendants were perfectly within their rights to send the strut to China to be copied, despite Tenneco's repeated attempts to paint that action as a black mark. As the district court noted, the law favors the copying of nonprotected items. The testimony Tenneco quotes from Defendants' President Gary Calagoure simply does not provide evidence of an intent to copy the product numbers. Calagoure admits that they sent the product to China to be copied, and that the numbers were stamped on the struts. He further characterizes this as a mistake that has been corrected. This is not a trade dress case, where the Court is necessarily engaged in a broad inquiry. Here, we are looking for evidence of intent to copy a specific mark, and that evidence is absent. Once the product number was already on the strut, it made perfect sense for Defendants to use it on packaging and labels, which they did until switching, as a result of this litigation, to new product numbers.[3] Therefore, although the district court's given reason for deeming the evidence irrelevant was incorrect, we find that Tenneco has not produced any evidence of intentional copying.

Because the three distributor declarations should have been considered below, we must briefly detail and weigh the evidence for all the factors.

### 2. Weighing All the Factors

#### a. Direct Consumer Evidence

Tenneco's only direct consumer evidence is the aforementioned declarations of three of its distributors, each declaring that from their experience in the field they personally associate the 171

---

[3]Because there is no evidence supporting the intentional copying of the product numbers themselves, we do not address Tenneco's assertion of a presumption in its favor.

product number with the Monroe brand.[4]  Taking all available inferences in Tenneco's favor, this factor weighs very slightly in Tenneco's favor.

### b.        Consumer Surveys

There are no consumer surveys in this case.  In cases where no survey evidence was filed this Court has treated the factor as favoring neither party, although it's absence certainly does not help the mark holder's effort to meet its burden to prove secondary meaning.  *See Herman Miller*, 270 F.3d at 313 ("While consumer surveys certainly would have been helpful to Herman Miller's claim, their absence is not fatal, at least on summary judgment.").

### c.        Exclusivity, Length, and Manner of Use

The district court noted that Tenneco claimed that it continuously used its "71" product numbers since 1983 and its "171" numbers since 2003.  These numbers appear on the struts, packaging, sales catalogs, sell sheets, price lists, and promotional rebates.  However, the district court noted that on the packaging the number is always prominently accompanied by the Monroe trademark.  For the purpose of the end consumer, the district court found that the "use of multiple marks appearing together suggests that the product number has a different purpose than identifying the product as belonging to Tenneco.  The Monroe mark identifies the source of the product, and the number identifies the type of product contained inside the package."  Tenneco does not seriously dispute this finding, arguing only that there is "no requirement . . . that a mark be used or advertised

---

[4]The only other evidence Tenneco submitted to the district court on this factor was Richard Alameddine's declaration, which the district court refused to consider following Defendants' objection.  Tenneco has not appealed that decision, so we do not consider it either.

alone in order to be entitled to protection." The district court's finding, however, is not a strictly legal one, but rather one of common sense, and is not incorrect.

Although neither of the parties nor the district court mentions it in this context, we also find it significant that the product numbers are used to specifically describe the strut and identify the vehicle to which the strut is designated. This use strongly favors Defendants' claim that these product numbers *primarily* describe the product, not the source. This factor strongly favors Defendants.

### d.     Amount and Manner of Advertising

The district court noted that Tenneco spent over $1.1 million in advertising that included the "171" product numbers, and that advertising reached around 75,000 potential and existing customers. The district court disregarded this assertion, however, because Tenneco offered "no evidence that Tenneco's advertising is directed to connecting its product numbers with its identification as the source of the products." Tenneco does not dispute this finding on appeal. Again, the lack of evidence does not weigh in favor of Defendants so much as it does not help Tenneco to satisfy its substantial burden.

### e.     Amount of Sales and Number of Customers

The district court did not note any evidence on this factor. The parties quibble over it, but Tenneco does not claim that this factor raises a genuine issue of material fact. Tenneco asserts it has about 80% of the struts market with about 1,500 customers and $26.6 million in revenue in 2007. Defendants argue this is irrelevant because Tenneco's customers are all distributors, and therefore Tenneco cannot connect these sales to any individual retail consumer. Tenneco responds that relying

solely on individual consumers to the exclusion of distributors is erroneous. For the same reasons we found the three distributor declarations relevant, we also find that sales volume is relevant. However, it does little if anything here to demonstrate that the product numbers have acquired secondary meaning. *See Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989).

### f.    Established Place in the Market

The district court did not note any evidence for this factor. The parties considered it together with the fifth factor—the amount of sales and number of customers. Therefore, for the reasons in subpart e., *supra*, this factor weighs very slightly in Tenneco's favor.

### g.    Proof of Intentional Copying

As explained above, Tenneco has not produced any proof of intentional copying.

### h.    Other Evidence

The district court also considered two pieces of other evidence. The district court found persuasive Mr. Enborg's declaration, in which he gave his opinion as a trademark expert that the Tenneco product numbers did not qualify as protectable marks because they are "descriptors that use a numeric code separately assigned to each strut assembly to describe its (i) product type and (ii) application to a particular vehicle chassis." The district court also gave substantial weight to the USPTO's decisions to deny Tenneco's patent applications because Tenneco's product numbers did not "distinguish Tenneco's goods from those of others."

Tenneco objects to the Enborg declaration, claiming that it is based on an erroneous view of the law and the facts. Defendants argue that Tenneco waived any objection to this evidence by not

objecting to it below, and further argue that the declaration is opinion from his experience, not a statement of law in all cases.

Tenneco does not argue with Defendants' assertion that it did not raise the issue below, and it has therefore waived the objection. "If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [this Court] will review such objections only to avoid a gross miscarriage of justice." *Johnson v. U.S. Postal Serv.*, 64 F.3d 233, 237 (6th Cir. 1995) (alteration in original). There is no gross miscarriage of justice here, or any other error, because the Enborg declaration is merely one trademark lawyer's opinion from years of experience in trademark practice. The district court was free to take it or leave it, and Tenneco was free to refute Enborg's opinion with its own evidence. The Enborg declaration will be considered with the other evidence.

The same goes for the USPTO decisions, which Tenneco strives mightily to distinguish or explain away or even demonstrate that they somehow cut in its favor. The mere fact of a USPTO decision reversing itself, and reversing itself again soon thereafter, does not create a genuine issue of fact for Tenneco. The USPTO denied Tenneco's nine applications because, in its judgment, Tenneco failed to establish secondary meaning with "ordinary retail customers," and because the product number "merely identifies a model number; it does not function as a trademark to identify and distinguish applicant's goods from those of others and to indicate the source of appellant's goods." The district court found these decisions to be persuasive, and Tenneco offers no plausible

reason why this Court should not do so as well. Both these sources of evidence weigh heavily in Defendants' favor.

### i. Summary

As stated above, "[a] descriptive mark achieves secondary meaning when 'in the minds of the public, the *primary significance* of a product feature or term is to identify the source of the product rather than the product.'" *Leelanau*, 502 F.3d at 513 (quoting *Inwood Labs, Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 851 n.11 (1982) (emphasis added)). Compiling the evidence above yields the following:

| | |
|---|---|
| 1. Direct consumer testimony | Very slightly favors Tenneco |
| 2. Consumer surveys | No evidence |
| 3. Exclusivity, length, and manner of use | Strongly favors Defendants |
| 4. Amount and manner of advertising | No evidence |
| 5. Amount of sales and number of customers | Very slightly favors Tenneco |
| 6. Established place in the market | Very slightly favors Tenneco |
| 7. Proof of intentional copying | No evidence |
| Enborg Declaration | Strongly favors Defendants |
| USPTO decisions | Strongly favors Defendants |

Considering these factors, particularly how weakly Tenneco's evidence supports its claim, we hold that Tenneco has not carried its substantial burden to demonstrate that a genuine issue of material fact exists as to whether the *primary significance* of the product numbers in the minds of the consuming public is to identify Monroe rather than the type of strut and what car it fits into. Accordingly, the district did not err in granting summary judgment on the product number claims.

## III.

Tenneco also alleged that Defendants infringed on their registered Quick-Strut marks based on four allegedly illegal uses of the mark: (1) Defendants' use of the mark at the *automechanika* auto show in Canada, (2) the use of the mark in Defendants' listing on the auto show's website; (3) the statements by independent contractor salesman in the United States using the mark, and (4) the use of the mark in the Auto-Wares Price Sheet. The district court addressed each of these incidents in turn. While Defendants admitted to using the Quick-Strut mark at the auto show, the district court found this was not an infringing act within the reach of the Lanham Act because it was done outside the United States by two Canadian corporations. The district court also found that the website reference did not support Tenneco's burden because it was on the auto show's website and there was no evidence Defendants were responsible for any of the material on the site. On the third-party salesman evidence, Tenneco relied on the sworn statement of Mr. Siegel, who then failed to appear at the hearing before the district court. The district court therefore credited the testimony of Defendants' witness Jim Dolmetsch, who strongly denied Siegel's assertions. Finally, the district court found that the Auto-Wares price sheet did not support Tenneco's burden. Defendants provided affidavits that the sheet was produced by Auto-Wares without their knowledge or consent, and that the sheet had been withdrawn as soon as Defendants requested Auto-Wares to do so. Tenneco did not provide any evidence to refute these affidavits. Because there was no evidence of an infringing act by Defendants in the United States, the district court granted summary judgment on the Quick-Strut infringement claims to Defendants.

On appeal Tenneco challenges the district court's findings on the second, third, and fourth incidents, apparently conceding that the Defendants' admitted use of the mark at the Canadian auto show does not come within the purview of the Lanham Act. Tenneco argues that Defendants gave *automechanika* the language to put on the website, and that Defendants are liable for contributory infringement. It further argues that the district court erroneously disregarded Siegel's declaration, and that a genuine issue of material fact remains about the price sheet because it had Kingdom's logo at the top of the sheet. Tenneco's arguments fail.

The protections of the Lanham Act extend to all marks in "commerce," which is defined as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. In *Steele*, the Supreme Court held that the actions of a United States citizen, Steele, making counterfeit watches in Mexico fell within the ambit of the act. 344 U.S. at 285. Relying on Steele's United States citizenship and the fact that his actions reached into the United States for supplies, the Court affirmed the lower court's ruling of infringement under the act. *Id.* at 285–288. The district court below relied on *Steele* in finding that Defendants' use of Tenneco's mark at the Canadian auto show was not actionable, a finding Tenneco does not dispute.

Tenneco's strongest assertion regards the use on *automechanika*'s website. Tenneco attorney Lisabeth Coakley's declaration presents the offending material, which consists of a single reference to the "StrutTek quick strut by Prime Choice" combined with Kingdom's booth number. As Defendants point out, this is a website for the Canadian auto show, hosted and maintained by that auto show, and Tenneco presents no evidence that anyone in the United States, other than their attorney, accessed this site or was confused by it. It is clearly not directed towards the United States.

23

The district court did not err in finding that this website reference did not sustain Tenneco's burden to prove infringement.

Tenneco's claim regarding the actions of the third-party vendors similarly fails. Even if the district court abused its discretion in disregarding the Siegel declaration after Siegel refused to appear for cross-examination at the hearing below, a fact Tenneco completely ignored in its briefs, on its face the Siegel declaration merely alleges that a third-party vendor made a passing remark that Kingdom was "going to start selling . . . 'Quick Strut' assemblies." The action of a third-party, without inducement by Defendants, is not an act of trademark infringement by Defendants. *See Inwood Labs.*, 456 U.S. at 853–854.

Finally, the district court did not err in finding that the use of the mark in the third-party Auto-Wares price sheet was not an act of infringement by Defendants. The only evidence to explain the origin of the price sheet is the declaration by Auto-Wares' Senior Vice President of Purchasing, Scott Grill, and Gary Calagoure's testimony. Both agree that Defendants had nothing to do with producing the price sheet, and that Auto-Wares removed it when Defendants asked it to. Tenneco cannot rely on the bare fact that a Kingdom logo is on the price sheet in the face of this evidence explaining its origin.

Taking every available inference in its favor, we hold that Tenneco has not carried its burden to prove that a genuine issue of material fact remains as to whether Defendants infringed upon their registered mark. Therefore, the district court did not err in granting summary judgment to Defendants on the Quick-Strut infringement claims.

**IV.**

We have jurisdiction over the denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1). We review the district court's legal rulings *de novo* and its ultimate denial of the preliminary injunction for an abuse of discretion. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).

"A plaintiff seeking a preliminary injunction **must** establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008) (emphasis added). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 377.

Because of our findings above this question is moot. Tenneco cannot establish that it is likely to succeed on the merits when it has lost on the merits.

**V.**

Accordingly, we **affirm** the district court's grant of summary judgment for Defendants and denial of Plaintiff's motion for a preliminary injunction.

**KAREN NELSON MOORE Circuit Judge, dissenting in part.** Because I conclude that Tenneco presents genuine issues of material fact with regard to its product-numbers claims, I respectfully dissent from Part II of the majority opinion.

With respect to the protectability of Tenneco's product numbers, I would first note that much of the evidence the majority cites as "[s]trongly favor[ing]" the Defendants has little probative value. In particular, both Enborg's declaration and the USPTO's decision offer what are essentially legal conclusions devoid of any evidence as to how consumers view Tenneco's product numbers. Furthermore, although the majority asserts that "the product numbers are used to specifically describe the strut and identify the vehicle to which the strut is designated," Maj. Op. at 17-18, this does not necessarily weigh against Tenneco. While the numbers may be used to "describe the strut," they do so by indicating that the strut is a "Monroe Sensa-Trac® product from Tenneco," Bill Dennie Decl. at ¶ 8, and thereby provide the sort of identifier that trademark laws are designed to protect.

I agree with the majority, however, that the evidence in favor of Tenneco is somewhat thin. Nonetheless, Tenneco has offered the declarations of three distributors, all of whom explicitly stated that they associate Tenneco's product numbers with Monroe brand products. Furthermore, although the majority concludes that there is no evidence that Kingdom intended to copy Tenneco's product numbers, a reasonable jury could infer such intent from the fact that Kingdom "sent a Tenneco strut to China with instructions to copy," Doc. 57 at 82 (Gary Calagoure Prelim. Inj. Test.), and did not exclude the product numbers from its instructions. Although this may not be overwhelming evidence, it is sufficient to survive summary judgment when combined with the other evidence that Tenneco has offered. Therefore, I respectfully dissent from Part II of the majority opinion.